**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KOHLER COMPANY, Respondent.**

**No. 16031.**

United States Court of Appeals District of Columbia Circuit.

Argued April 26, 1965.

Decided Sept. 2, 1965.

---

Mr. Paul Elkind, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief for petitioner.

Mr. Lyman C. Conger, Kohler, Wis., with whom Mr. E. Riley Casey, Washington, D. C., was on the brief, for respondent.

Messrs. Joseph L. Rauh, Jr., John Silard, Stephen I. Schlossberg and B. Michael Rauh, Washington, D. C., filed a brief on behalf of Local 833, UAW-AFL-CIO, as amicus curiae.

Before BAZELON, Chief Judge, and EDGERTON and WILBUR K. MILLER, Senior Circuit Judges.

BAZELON, Chief Judge.

These contempt proceedings are the latest round of a controversy which erupted over eleven years ago when the Kohler strike began. Despite repeated resort to the National Labor Relations Board and the courts,[1] the controversy

1. The Kohler Co., 128 N.L.R.B. 1062 (1960), enforced and remanded for further proceedings *sub nom.* Local 833, United Automobile Workers AFL-CIO v. N. L. R. B., 112 U.S.App.D.C. 107, 300 F.2d 699 (1962), cert. denied 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962), on remand 148 N.L.R.B. No. 147 (1964), enforced *sub nom.* Kohler Co. v. N. L.

shows no signs of abating. This is an extra-inning game, even by modern judicial standards.[2] Unless the parties step out of character and achieve a compromise, it appears that many innings lie ahead.

The issues here have their roots in a Board order of August 26, 1960. That order, *inter alia,* required the Kohler Company to offer reinstatement upon application to the great majority of its striking employees, and to dismiss, if necessary, their replacements. Failure to make such an offer was to entitle the employee to back pay, beginning five days after his application and continuing until an offer was made.[3] Immediately after entry of the Board's order, Kohler offered reinstatement to certain of the strikers for whom application had been made. Despite repeated advice from the Board during compliance proceedings, first formally tendered in April 1961, Kohler insisted it had thus fully complied with the reinstatement provisions. On March 1, 1962, we enforced the Board's order without change.[4] In July 1963, the Board asked us to hold Kohler in contempt of our decree. We referred the issues to a special master. He has filed findings of fact and conclusions of law, supplemented by a full and learned opinion; he concludes that Kohler has violated our decree. Our present task is to review these findings and conclusions.

As will appear, we think Kohler has failed in several respects to comply with the Board's reinstatement decree, as we enforced it. However, the Master did not attempt to ascertain which employees were wrongfully denied reinstatement by Kohler but stated conclusions as to broad classes of employees. We think we should not enter a contempt order before we know exactly whom Kohler should have reinstated. Accordingly we remand to the Master, under such guides as will appear, for identification of these individuals. The Master's findings, unless clearly erroneous, will then furnish the basis for any adjudication of contempt.

That order of adjudication will require Kohler to offer reinstatement to the identified employees and provide for allocation of costs, incentives to speedy action and other such matters as we deem appropriate.[5] This probably will not end the proceedings, however. There will be persons who, although wrongfully denied reinstatement, are now entitled at most to limited back pay, death benefits or other relief, because of intervening events precluding reinstatement. When reinstatement is offered, the amount of back pay must also be determined. These questions are to be determined by the Board, for they are within its special competence. N. L. R. B. v. New York Merchandise Co., 134 F.2d 949 (2d Cir. 1943) (per L. Hand, J.); Wallace Corp. v. N. L. R. B., 159 F.2d 952 (4th Cir. 1947); Note, The Role of Contempt Proceedings in Enforcing Orders of the NLRB, 54 COLUM.L.REV. 603 (1954). We anticipate postponing consideration whether Kohler has purged itself of con-

R. B., 120 U.S.App.D.C. 259, 345 F.2d 748, decided April 20, 1965 cert. denied 86 S.Ct. 82; United Automobile Workers v. Wisconsin Employment Relations Board, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956), affirming 269 Wis. 578, 70 N.W.2d 191 (1955).

2. *Cf.* 33 U.S.L. Week 2616, May 25, 1965 (remarks of Friendly, J.).

3. Implicit in this provision were Board doctrines conferring limited rights to back pay, death benefits, or similar employee prerogatives, should an employee become ineligible for reinstatement in the interim between his application and the Company's offer.

4. 112 U.S.App.D.C. 107, 300 F.2d 699 (1962).

5. The Master should inform the court if, in view of the proceedings before him or such others matters as come to his attention, he concludes that Kohler should be assessed costs at more than its aliquot share, that incentives to speedy compliance are appropriate, or that ultimate compliance with this court's decree of March 1, 1962, will not suffice to purge Kohler's contempt.

tempt until the Board's determinations of these questions are final.[6]

## I. Releasees and Retirees

We first consider whether two groups of strikers—"releasees" and "retirees"—were "striking employees" when Kohler refused their applications for reinstatement at the end of the strike and were therefore entitled to reinstatement.

## A. Releasees

■ The releasees here involved are 82 of the 133 strikers who secured formal releases from employment with Kohler prior to the strike's end. These releases were evidence by printed cards, prominently headed "Release from Employment," and signed by the employee as well as Kohler's representatives. Kohler did not request any employee to sign a release, even if he took interim employment. It listed all strikers as employees unless and until they applied for release. Thus, Kohler argues, an employee's acceptance of a release was an unequivocal act of resignation, and reinstatement need not have been offered. The Board contends that the 82 strikers it has identified executed the releases under economic compulsion, since they needed work during the strike and prospective employers required releases. It offered to show that the named workers had not intended to give up employment at Kohler and, in at least some cases, had notified Kohler of that fact, either at the time of seeking release or by personally seeking reinstatement when the strike ended.

The Master exonerated Kohler in regard to the releasees. He found that the releasees were "estopped from asserting that they did not, on obtaining the release, intend to permanently abandon their employment with the Company." He grounded this conclusion in broad equitable principles. He said it was plain that "the individuals who procured a release * * * knew what they were doing." Even though other employers required the releases, he thought there was an "element of deception" involved in the workers' professed intent to remain "Kohler strikers," entitled to reinstatement. Such deception, he said, is "abhorrent to American principles of justice," and should not be condoned by a reinstatement order. An added consideration, he stated, was that proof of worker intent, if accepted as a standard for deciding the reinstatement issue, was too uncertain at this late date, and would put the Company to an unfair disadvantage.

We think the releases did not operate as an estoppel to reinstatement. The Master recognized that "the fashioning of orders to effectuate the policies of the act is primarily the function of the Board." However, he gave no credence to Board cases holding that employees who had signed releases were not thereby conclusively deprived of any reinstatement right, but that intent to resign was in every case a question of fact.[7] Supreme Court authority confirms the Board's central role in the definition of "employee," N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), and the Board's power to order reinstatement of employees who had found other employment, if to do so would effectuate the remedial policies of the Act, Phelps Dodge Corp. v N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). No one doubts that the Board meant to include releasees as "striking employees" under the reinstatement order unless they had in fact abandoned the strike. To give the releases conclusive weight is to adopt a view of the Act which is inappropriate to both the Act's remedial aims and the Board's prior definition [8] of the meas-

6. 29 U.S.C. § 160(e, f).

7. Pacific Tile & Porcelain Co., 137 N.L. R.B. 1358 (1962); Hatch Chevrolet, 136 N.L.R.B. 284 (1962); J. E. Plastics Mfg. Corp., 131 N.L.R.B. 299 (1961); Fafnir Bearing Co., 73 N.L.R.B. 1008 (1947); Toledo Desk & Fixture Co., 65 N.L.R.B. 1086 (1946); Peerless Pattern Works, 64 N.L.R.B. 1473 (1945); Republic Steel, 62 N.L.R.B. 1008 (1945).

8. See, e.g., Phelps Dodge Corp. (on remand), 35 N.L.R.B. 418 (1941).

ures necessary to the effectuation of those aims.[9]

Contrary to the Master's view, the Board's case for contempt does not depend entirely on the strikers' possibly faulty memories of an intent to remain Kohler employees. If it did, treating the releases as conclusive evidence of intent might not have been erroneous. But the Board offered to show that the releases were signed under economic compulsion. It also sought to prove acts contemporaneous with release of the union's application for reinstatement from which intent might be inferred. This proffer, which the Master refused, apparently did not consist solely of striker testimony about intent. While, for example, a releasee's acts at the end of the strike might be less convincing than notice given Kohler when the release was signed, each matter is probative of intent. The proffer should have been received.

Nor are we concerned that recognizing the possibility of a right to reinstatement might, as the Master feared, "[shift] to the Company the burden of determining, at its peril, whether the [release forms] should be relied upon." This kind of burden is borne whenever the Board requires affirmative action. Here, the Company was required to determine which release forms did and which did not reflect employee intent to resign. Its determinations would have been entitled to great weight in measuring compliance. But none were made.

We conclude that upon the present record, at least, Kohler cannot be found free of contempt in its treatment of the releasees. The Master must ascertain, as a question of fact in each case, whether a releasee intended by signing the release to resign. Questions of credibility and demeanor, which necessarily include consideration of the effects of the passage of time, are, of course, for the Master.

## B. Retirees

The alleged retirees are 72 strikers each of whom had applied for and received pension benefits under the Company's plan before the end of the strike. There was no mandatory retirement age, and Kohler did not seek applications for retirement benefits. Employees filed forms prominently headed "Notice of Retirement." Kohler claimed that filing such a form was an unequivocal act of withdrawal from employment, foreclosing reinstatement rights. The Board contended that the forms were signed under economic duress, rather than with real intent to retire, and that the named workers had not intended to give up their employment and, in some cases at least, had so informed the Company.

The Master upheld Kohler's claim. Although Kohler's group insurance contract does not restrict pension rights to persons who have actually retired, and Kohler had no mandatory retirement age, the Master found a "practical construction" of the contract required the conclusion that retirement had occurred. This implies that, even if a claim of pension rights was induced by economic straits brought on by the strike, the claimant must have understood that he was retiring from Kohler's employ.

We think the record does not support the Master's conclusion. Consideration must be given to the possibility of economic duress and to the apparent fact that neither Kohler nor the insurance company would have suffered added expense were the pensioners allowed to return to work. As in the case of the releasees, a determination of intent need

---

9. Even assuming that the Master was correct as to the effect which "deception" should have, deception does not appear on this record. There are untested allegations that Kohler was told by at least some of the "releasees" that they expected to be back at strike's end—and even, that Kohler encouraged this belief in dealings with them and the Union. There was no showing that any employee, much less all in this class, had told his new employer that he hoped his new job would be permanent, or that he would not return to Kohler. The Master's finding is thus unsupported on the record.

not rest on pitting the claimant's memory now against the form he signed then. It is alleged that certain retirees informed Kohler of their intent. There may be others who made individual efforts to return to work at the strike's end. The Union's application for reinstatement named less than one-third of the strikers who had retired during the course of the strike. This suggests that further evidence might be found in its files. It is possible that workers older than the normal retirement age of sixty-five at the close of the strike would have declined reinstatement offers for reasons of age, even if age was not behind their elections to receive pension funds at earlier dates. Consequently, it would be appropriate for the Master to require a strong showing of availability for work in these cases. But we think an attempt must be made, on a case-by-case basis, to determine whether any of the 72 retirees had intended to retain their status as "striking employees." If so, they were entitled to reinstatement.

## II. Workers Who Refused Reinstatement

The Union made an unconditional application for reinstatement of about 1800 named employees on September 1, 1960, just after the Board's decree. Kohler soon sent offers of reinstatement to about 1400 of them. A substantial number either refused or did not respond to this offer. We must decide whether the Master correctly found that Kohler's offer to them was not in compliance with the decree; that the reasons some gave for not then accepting the offer entitled them to further offers upon their subsequent application; and that they have not waived any rights they might have under the decree.

The relevant facts, which we adopt from the Master's findings and memo-

randum, are these. Kohler's work force during the summer of 1960 was about 2400 employees, roughly three quarters of the pre-strike number. The work week, averaging a little more than forty hours over the plant as a whole, was almost four hours shorter than it had been in 1954. As the summer of 1960 drew to a close, adverse economic conditions which had helped to bring about this condition created a serious problem of overproduction, and the Company determined to cut back further. Rather than lay off workers, it decided to reduce the work week of a majority to 32 hours and to peg the week of other employees at 40 hours. As a matter of long-standing policy, it preferred a flexible work week to a flexible working force. This step was announced less than a month before the Board's order.[10]

During the six years of the strike, Kohler hired over 1200 replacements. It announced early and often that they were being "taken on as permanent employees," and would not lose their jobs at the termination of the strike. The Board's order, however, required Kohler to discharge replacements "if necessary" to afford returning strikers their "former or substantially equivalent" positions. Kohler made offers of reinstatement to a group almost two-thirds as large as its current work force. The economic conditions which had led it to cut back the work week still prevailed and apparently continued until the late spring of the following year.[11] Yet the Master found that "after the Board's decision was rendered, the Company made no secret of its intention to retain its existing employees and simply add returning strikers to the existing work force, regarding itself as being entitled to do so under the decision." This is what it did; the 477 strikers who returned to work were simply added to the force.

10. The Master refused to find that the reduction of hours was not legitimately grounded in the economic conditions prevailing, but a step taken in anticipation of the Board's decree.

11. The Company continued to allow the work force to shrink by attrition; in January it laid off enough workers to reduce the force below its August levels; the 40-hour average work week was not reinstated until April.

On the day it requested reinstatement for Kohler's striking employees the Union in another letter requested Kohler to resume bargaining, in compliance with the Board's decree. While Kohler's offers of reinstatement were still open, Kohler said it would not resume bargaining until appellate review of the Board's order was completed.

The Board alleges that 105 strikers refused Kohler's offer of reinstatement because of the short work week and Kohler's insistence on retaining all replacements. Another 238 allegedly refused to return because of the refusal to bargain. Finally, 180 strikers allegedly did not return because of both the short week and the refusal to bargain. At least some of these strikers expressly informed Kohler of the reasons for their action.

In June 1962, shortly after the Supreme Court denied *certiorari* in Kohler's appeal from our enforcement of the Board's decree,[12] Kohler resumed bargaining with the Union. In a letter sent in July 1962, the Union requested reinstatement for all strikers not previously reinstated, making specific reference to the three groups identified above. It refused, however, to comply with Kohler's request for a list of the strikers comprising each category. The Company made no offers of reinstatement in response to the Union's request.

### A. Kohler's Compliance

▆ The Master concluded, and we agree, that Kohler's offer failed to comply with the Board's order. An employer is not required to dismiss one replacement for every unfair labor practice striker reinstated pursuant to Board order. The purpose of the Labor Act is to

remedy the effects of unfair labor practices, not to punish strikebreakers. But after an unfair labor practice strike, effective remedy requires that returning strikers be given a preference. N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938), 130 F.2d 919 (2d Cir. 1941) (on remand). The sanctioned purpose of a reinstatement order is "to insure the returning strikers that the strike should not prejudice their position; that is, that they should have as good jobs as though there had been no strike." N. L. R. B. v. Giannasca, 119 F.2d 756, 758 (2d Cir. 1941) (per L. Hand, J.). Here, economic factors had already diminished substantially the available work. Kohler diluted it further by deciding to add, rather than substitute, returning strikers. As the Master said, "[T]he strikers * * * had to take their chances on a work week adjusted * * * to [the Company's] business and its policy of reducing the work week rather than laying off employees, but not * * * based upon retention of employees hired on or after June 1, 1954." When Kohler enlarged its work force in the face of economic trouble rather than break its promises to the replacements, it violated the Board's decree. "[T]he order secured [the strikers] the benefit of [Kohler's] judgment based upon the number of men who could efficiently do the work in hand," N. L. R. B. v. Giannasca, *supra* at 758. Kohler denied them the benefit of that judgment.[13] The promises Kohler had made to their replacements do not excuse this denial. Consequently, there was no valid offer of a "former or substantially equivalent position."[14]

12. 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed. 2d 405 (1962).

13. Had all strikers returned, Kohler's policy would have meant a 60% increase in its work force. With roughly 500 strikers actually returning, a 20% increase occurred.

14. Throughout these proceedings, and in negotiations with the Board, Kohler has

consistently ignored the problem involved in its treatment of the strike replacements, and concentrated on the "economic justification" it claims for its reduction of the work week, note 10 *supra*. It now claims, however, that the Master should have found that economic conditions, which in August required the thirty-two hour week, looked so rosy by September that the Company could think a twenty

## B. Workers Entitled To Reinstatement

Clearly, workers who did not accept Kohler's offer because of the Company's position with regard to replacements and the shortened work week did not receive the benefits of the order we enforced. Different questions arise with respect to strikers who assigned refusal to bargain, or both the short work week and the refusal to bargain, as the reason for not returning.

 The Board has sought an adjudication of contempt less sweeping than our decree might support. Rather than argue that Kohler's offer of reinstatement was defective as to *all* workers because of the Company's refusal to discharge replacements, it concedes that unless a worker knew of and relied on this defect, the offer was complying as to him. The Board may have thought this a limited concession, made to avoid imposing heavier burdens on Kohler than the remedial goals of the Act require.[15] But the concession raises a broader question—whether Kohler has met its obligation to all strikers who did not rely on the defect found. As to them, the concession seems to imply that Kohler made a complying offer, its only reinstatement obligation. It would thus appear that any right to protest Kohler's continuing refusal to bargain would be protected under the Act, N. L. R. B. v. R. C. Can Co., 328 F.2d 974, 978–979 (5th Cir. 1964), but not under the decree we enforced. Accordingly, the argument runs, when at the conclusion of their protest the Union members sought and Kohler refused reinstatement, the Board's proper response would have been to bring new

unfair labor practice proceedings seeking an order for reinstatement.

The argument does not convince us because it neglects Kohler's non-compliance with another important provision of the decree, requiring it to bargain in good faith with Local 833. Kohler refused to bargain in order to avoid mooting its challenge to the Union's bargaining status. Although its reason for refusing may have been sound, we think that in essaying piecemeal compliance with the Board's decree it left open the possibility of such protest as here occurred. In the circumstances, Kohler's refusal to bargain was a continuation of its illegal course of action, interdicted under the decree and not a *new* cause for protest. We agree with the Master and the Board that workers could refuse to accept a complying offer of reinstatement when the Company in other respects ignored the Board's decree, without forfeiting their reinstatement rights.

 We touch here on the rather unusual nature of contempt proceedings in connection with Labor Board orders. Our decree was patterned after the Board's administrative determination of the steps required to redress Kohler's unlawful behavior during the strike. But this determination did not resolve every question that might arise when compliance was attempted. We cannot anticipate all such questions and do not have the expertise to determine what resolution will provide the needed remedies. Board compliance officers, who act on behalf of the Board and are subject to review by it, regularly handle such problems. In construing our decree, we should give great

---

per cent increase in its work force was feasible. Even if we agreed with Kohler's assumption that an offer to work at the short week would have been complying had such a changed outlook existed, the Master's refusal to find such a change was not clearly erroneous. Had Kohler dismissed strike replacements, there would have been more work available to the returning strikers, and their work week would have been determined by economic considerations alone.

15. Decisions made in petitioning for adjudication of contempt, like decisions to bring unfair labor practice charges, are inextricably bound up in the policies of the Labor Act. They are within the Board's special province. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L. Ed. 738 (1940).

weight to determinations by these officers and the Board as to its meaning.[16]

The pleadings here disclosed such determinations. Correspondence between Kohler and Board compliance officers, submitted at our request, shows that Kohler early sought the Board's aid in construing the reinstatement order, particularly with respect to those workers who had not returned because of the refusal to bargain, the short week, or similar reasons. In April 1961, eleven months before our decree, the Board's officer responded. He said, as the Board does here, that employees have "the right to refrain from accepting the Company's offer of reinstatement until the Company has complied with the Board's bargaining order. If and when they apply unconditionally for reinstatement, the Company must offer [it] * * *."[17] Kohler disagreed and has not been willing to compromise in any respect.[18] The correspondence was not in the record when we issued our decree and Kohler did not attempt to define our decree at that time. Thus, it cannot be said that we adopted the Board's interpretation of its order by entering our decree of enforcement. But the nearly contemporaneous construction of the Board's order by its officers reinforces our conclusion that the Master was right in finding that Kohler violated our decree by failing to offer reinstatement, when sought, to the "refusal-to-bargain" strikers.

 Kohler argues that we should distinguish workers who complained of the Company's refusal to bargain from others who said they would not return because Kohler had made no contract with the Union. It says that though the decree required it to bargain it is not required by either the decree or the Act to enter a contract, and therefore the "no contract" group should not be protected. While this distinction has technical merit, we agree with the Master and Board that it overlooks the realities of the situation. Union members cannot be expected to speak with legal precision in this matter. It is enough that they sought reinstatement during bargaining, and before a contract was signed.

 Kohler argues also that the Union made no valid application for reinstatement, because its request of July 1962 did not include a list of names. But Kohler had been given a list of strikers seeking reinstatement in September, 1960, and the record shows that at least some of the strikers who did not return informed Kohler of the reasons for their decision. Where such notice had been given, Kohler did not need a new list in 1962. On the other hand, Kohler should not be required to reinstate workers who only now claim reasons for refusal which they may not have had in 1960. Unless a worker informed Kohler of the reason for his refusal to return, or manifested his reason to the company in some other way (*e. g.*, by applying *individually* for reinstatement after bargaining was resumed in 1962), the Master may properly exclude him from reinstatement. As in the case of releasees and retirees, the questions of fact should be resolved with an eye to the remedial purposes of the

16. It may be noted that although we must decide questions of Kohler's obedience to our decree, they involve problems of labor policy and the meaning of the Labor Act which would ordinarily be decided by the Board in formal compliance proceedings. See sources cited in text at note 6 *supra*.

17. The Board also said that releasees and retirees were entitled to offers, and that "those who rejected reinstatement because of the 32-hour work week must be sent offers without further application on their part." In subsequent correspondence, it expressed the view that

back pay was running for all who deserved offers without application for reinstatement on their part.

18. We cannot agree with Kohler that the correspondence shows its attempts at good faith compliance with the Board's order. The correspondence reveals a rigid determination to give the narrowest possible reading to the order and our decree. In at least one instance, this rigidity has led Kohler to ignore almost entirely the basis of the Board's position, note 14, *supra*.

decree, and the workers' lack of legal sophistication. But if convinced that Kohler could not have known that a worker was seeking reinstatement in 1962, the Master may deny reinstatement.

In sum, we agree with the Board and the Master that the following workers are entitled to receive offers of reinstatement under our decree: those who refused to return because of the short work week and the failure to discharge strike replacements,[19] those who refused to return because of failure to bargain in good faith with the Union and reach a contract, and those who relied on both the short week and the failure to bargain. In fairness to Kohler, however, we think the Master may exclude from these groups any worker as to whom there is neither contemporaneous evidence of his reason for refusing,[20] nor a subsequent individual application for reinstatement.

### C. Back Pay Rights

As we have stated, we are not asking the Master to determine back pay amounts. However, the Board recognizes that those strikers who refused to return to work in 1960 because of Kohler's refusal to bargain were entitled to reinstatement only as of their July 1962 application. A determination that a striker was a "refusal-to-bargain" striker would thus limit the amount of back pay available to him. To this extent, the Master will be making back pay decisions.

This becomes important in regard to those workers who relied on both the refusal to bargain and the short work week. The Master felt they, like the refusal-to-bargain strikers, should be accorded back pay from July 1962. The Board argues that unless Kohler can show that a particular worker would not have accepted an offer complying as to work week and treatment of replacements, he should get back pay from September 1960. In support of this argument, the Board cites Atlantic Maintenance Co., 134 N. L. R. B. 1328 (1961), enforced, 305 F.2d 604 (3d Cir. 1962); L. Ronney Sons Furniture Mfg. Co., 97 N.L.R.B. 891 (1951), enforced as modified, 206 F.2d 730 (9th Cir. 1953); cf. N. L. R. B. v. Remington Rand, Inc., 94 F.2d 862, 872 (2d Cir. 1938), cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938). Kohler says these cases establish only that "where an employer places an *illegal* condition on his offer of reinstatement he should bear the burden of proving that a striker would have rejected the offer even had it not included the illegal condition." (Emphasis supplied.) But when enforcement is sought through contempt rather than unfair labor practice proceedings, the question is not whether the condition was illegal but whether it complied with the Board's order. We have already agreed with the Master that it did not. Therefore, he should determine on remand the date on which each of these "dual reason" strikers became eligible for back pay.[21]

### III. The Reinstated Strikers

At Kohler's insistence, the Master considered the back pay rights of the 477 strikers who returned to work in response to Kohler's 1960 offer of reinstatement. While we do not disagree with his con-

---

19. We treat these as equivalent reasons, as the parties and the Master have throughout. The failure to discharge replacements was one cause of the short work week. As in the case of workers who said they would not return because no contract had been signed, we think the statement of reasons need not have been exact. Reference to the short work week was sufficient to voice protest to the Company's policy vis à vis strike replacements.

20. We assume that in most cases, this will take the form of notice to Kohler. In the absence of such notice or an individual application, "refusal-to-bargain" strikers may be excluded. In the case of "short work week" strikers, however, we think any contemporaneous indication of intent would suffice, since no new application for reinstatement could be required of them.

21. We realize, of course, that this issue might be reserved for the Board, text at note 6 *supra*, but it does not require the Board's expertise and it resembles other issues the Master is being called upon to decide. In the interests of efficiency, we assign it to him.

clusion on the merits,[22] we think he erred in determining the claim. It relates only to back pay, and will not be ripe until Kohler's obligations are fixed by Board action. Thus this issue is still before the Board, for such back pay proceedings as it may deem appropriate in view of the remedial purposes of the Act.[23]

### IV. Participation of the Union

■ Long after this cause went to the Master the Union moved to intervene. We referred this motion to the Master, who denied it. He thought party status for the Union inconsistent with Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561 (1940). In any event, he thought the Union motion so late as to threaten substantial interference with the hearings before him. We affirmed. The Union seeks reconsideration.

In *Amalgamated Utility Workers,* the Supreme Court found a union without standing to bring contempt proceedings on an enforced Board decree. The decision to seek an adjudication of contempt, it said, was as much a question of public policy as any enforcement decision before the Labor Board. Consequently, only the Board was competent to make it. With less force, this reasoning applies to a union's motion to intervene in contempt proceedings already brought by the Board. The Board must prevail if there is conflict between it and the union on the extent to which findings of contempt should be sought, the remedy desired, or the legal theories to be advanced.

And the possibility of conflict is the major prop to party status.[24] Moreover, the Union's delay in seeking intervention supports a denial of that status, even if *Amalgamated* does not apply. We confirm our view that the Master did not err.

■ In this opinion, however, we have intended to resolve the fundamental questions of policy and law on which Board-Union conflict might arise. What remains is particular inquiry into factual questions: which employees fall into what categories for which relief may be ordered. It would appear that the Union could make a substantial contribution to this inquiry, and would be entitled to participate were these proceedings before the Board. Moreover, it does not seem that Union participation will markedly delay or hinder the proceedings. Accordingly, we suggest to the Master that it would be appropriate for him to permit the Union to participate in the forthcoming proceedings.

### V.

We have considered the parties' objections and arguments and, to the extent they are not dealt with above, find it unnecessary to discuss them. The record will be returned to the Special Master for proceedings in accordance with this opinion.

So ordered.

WILBUR K. MILLER, Senior Circuit Judge, dissents.

---

22. The Master found that they are entitled to a remedy for the difference between the hours they worked and the hours they would have worked had Kohler discharged replacements in good faith compliance with the decree.

23. We note that in January 1961—four months after its initial attempt at compliance with the Board's decree—Kohler did discharge sufficient striker replace-

ments to bring its work force well below August 1960 levels. This is a factor which may be relevant to any back pay proceedings.

24. The Board has repeatedly said it would welcome Union participation in this case. But the *Amalgamated* holding seems to arise from considerations of public policy, which the Board is not competent to waive.