**TRINITY VALLEY IRON & STEEL COMPANY, a division of C. C. Griffin Manufacturing Company, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 23856.

United States Court of Appeals
Fifth Circuit.

May 1, 1969.

John B. Nelson, John Edward Price, Fort Worth, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marion Griffin, Glen M. Bendixsen, Attys., NLRB, Washington, D. C., for respondent.

Before JOHN R. BROWN, Chief Judge, WISDOM, Circuit Judge, and BREWSTER, District Judge.

JOHN R. BROWN, Chief Judge:

Trinity Valley (the "Employer") and the National Labor Relations Board (the "Board") are before this Court on petition for review and cross-petition for enforcement of a Supplemental Backpay Order stemming from allegedly tardy and inadequate reinstatement of over 80 unfair labor practice strikers who walked off their jobs for approximately six months during a dispute which occurred nearly ten years ago.[1]

---

1. Jurisdiction arises under Sections 10(e) and (f) of the N.L.R.A., as amended, 29 U.S.C. § 160(e) and (f) (1964). This Court earlier enforced the Board's Original Decision and Order requiring "immediate and full reinstatement," as well as appropriate backpay for undeniable delay in compliance with these Board requirements. NLRB v. Trinity Valley Iron & Steel Co., 5 Cir. 1961, 290 F.2d 47, enforcing 127 N.L.R.B. 417 (1960). Following a hearing before a Trial Examiner, during which exhaustive statistical and factual evidence was introduced by both the Employer and General Counsel, the Board rendered its Supplemental Decision and Order now before us. 158 N.L.R.B. 890 (1966). On review, this Court has been confronted with a plethora of briefs, reply briefs, supplemental mem-

Certain threshold facts can be severely compressed. On June 8, 1959, the Union[2] struck the Employer in an *economic* dispute. Some replacements were hired. On June 30, 1959, the dispute evolved into an unfair labor practice strike by virtue of certain Employer conduct not herein material. Thereafter, the majority of the striker replacements were hired.

On December 11, 1959, the International Representative of the Union informed the Employer by letter that its strike was officially terminated, that all picketing had been ordered discontinued immediately, and that the letter constituted an "unconditional request on behalf of each of the striking employees [a list of whose names was supposedly appended to the letter] for reinstatement to [his] former position or [alternatively] other employment * * *." The letter asked where and when the returning strikers should report for work.

Following a telephone conversation between the Union spokesman and the Employer counsel in which neither was willing to admit that he could then state conclusively what those whom he represented would ultimately do, the Employer replied by letter dated December 14, 1959, that strikers "who desire to individually abandon the strike and report for work" should appear at the foundry on December 19, 1959 and that "problems of feeding these people into the process of production are going to be rather numerous * * *."

No more than 38 strikers reported on the designated date. Two of these, for reasons not material herein, are not in-

volved in the instant backpay proceeding.[3] Forty-six other strikers straggled back individually, 35 reporting by December 31, 1959, ten more appearing in January 1960, and one showing up on February 2, 1960. *None of the replacements hired during the strike were discharged as the strikers gradually returned to work.*

General Counsel noted the following statistical information. The maximum work force *before* the strike, computed quarterly for the preceding year, averaged only 142 employees. The work force, including returned strikers and retained replacements for the quarter *after* the strike terminated averaged 164 employees.[4]

Brandishing various other statistics based upon his reading of the Employer's production and employment records, General Counsel made several other observations critical to any disposition of this case. Returning strikers found the Employer had *less* business than before the strike, he had decreased the work schedule from five to four production cycles per week, yet he maintained a work force averaging 22 more employees (during the quarter immediately following the strike termination when the strikers were returning) than the annual pre-strike average complement. Translated into pocketbook terminology according to General Counsel, less business and fewer production cycles per week with an increased post-strike work force size meant *ipso facto* that returning strikers worked an average of twelve less hours per week,

oranda, a two-volume multilith record, and a supplemental multilith record, adding over 750 pages to the already exhaustive documentary evidence marshaled in the agency proceedings.

2. International Molders & Foundry Workers Union of North America, AFL–CIO, Local 9, Fort Worth, Texas.

3. See R. 51 n. 9.

4. General Counsel, referring to Employer's records, indicated that the number of retained replacements gradually diminished through normal attrition over the year

1960; and the composite work force (original non-strikers, returned strikers, retained replacements, and post-strike termination new hires) correspondingly decreased to approximate annual pre-strike average in December 1960. (G.C. Exhibit No. 7). *See* note 14, *infra.* Consequently, December 1960 was determined by the Board to mark the termination date for any backpay liability which the Employer might sustain under any theory advanced by General Counsel and adopted by the Board. (R. 62.)

including virtual elimination of weekly overtime hours for which compensation would have been made at one and one-half the "regular" rate as required by the Wage Hour Law.[5]

Finally, the returning strikers were admittedly reinstated without credit for two five cent per hour periodic wage increases, normally accrued on a regular quarterly basis but denied strikers who were absent when they were awarded. The Employer asserts these were "merit" increases awarded on the basis of performance shown and experience gained; General Counsel, using more elaborate statistics, concluded these periodic increases had been granted to over 90 percent of otherwise eligible employees.[6]

---

5. Fair Labor Standards Act (F.L.S.A.), as amended, 29 U.S.C.A. § 201 et seq. (1964). General Counsel compiled the following figures in support of his position:

| Quarter | | Weekly Average Hours |
|---|---|---|
| 3rd | 1958 | 49.1 |
| 4th | 1958 | 47.3 |
| 1st | 1959 | 46.6 |
| 2nd | 1959 (Strike commenced) | 48.0 |

| Quarter | | Weekly Average Hours |
|---|---|---|
| STRIKE PERIOD — NO AVERAGE HOURS COMPILED | | |
| 1st | 1960 | 38.4 |
| 2nd | 1960 | 36.8 |
| 3rd | 1960 | 40.5 |
| 4th | 1960 | 35.4 |

(R. 52 n. 10; drawn from General Counsel Exhibit No. 7, see Board Brief, p. A–3.)

---

6. The General Counsel's Exhibit No. 6 noted:

"The individual payroll ledger sheets of all employees employed from January 1, 1958, through December 31, 1961 were checked for the period from June 8, 1959, through December 31, 1962. *In order to simplify the gathering of these statistics, only those employees who worked for at least a year were considered.* Each 90-day period during which an employee was eligible for a periodic increase was counted. Each quarter in which an employee received an increase was counted separately. Employees *in this group* were eligible for increases in 567 quarters and received them in 552 quarters or in 97.35% of the quarters in which they were eligible. On certain of the payroll cards, the respondent had written the notation "hold." This amounted to 40 quarters. If this amount were added to the quarters during which employees were eligible, it would make a total of 607 quarters. Using that figure, raises were still given in 90.93% of the quarters in which the employees were eligible." (Emphasis added.)

In Appendix A to Exhibit 6, General Counsel listed eight employees whose cards had reflected the 40 "hold" notations. In Exhibit 6, the General Counsel statistically summarized the following information:

"Total payroll cards checked ............428
"Exclusions
 Worked less than a year .......192
 Not working during period
 checked ..................... 58
 Already at top rate ............ 56
 On mileage .................. 1
 Temporary Employee .......... 1
 Non-representative job
 classifications ............... 9 317

 Cards considered .............. 111"

Non-representative job classifications were those which revealed no history of increases and no indication of top rate.

The Trial Examiner, showing only cautious use of General Counsel's questionable statistical computation, merely noted:

"Although not every employee received these raises, they were given with such a high degree of regularity

On the above facts, the Trial Examiner and the Board arrived at conflicting conclusions as to what the Employer's backpay obligation should be under the Original Board Order enforced by this Court. Their respective figures for total amount due were over $42,500 apart (with the Board arriving at an amount of $71,979.-78 onto which we are asked to stamp our judicial imprimatur).[7]

On review, this case can be reduced to six issues:

(1) Whether rejection by General Counsel of a compromise backpay settlement, agreed upon and signed by a representative of his Regional Office, and issuance by General Counsel thereafter of an amended backpay specification (in an amount eight times the sum of the original specification and formulated on three entirely new theories) constitutes "punishment" prohibited by the Act;

(2) Whether *economic* strikers allegedly *permanently* replaced *before* the dispute became an unfair labor practice strike are entitled to backpay when Employer, without advancing any business justification, seeks to deny them "full and immediate" reinstatement after their timely application;

(3) Whether strikers, who fail to report on the date designated by Employer in response to Union's blanket reinstatement request, have waived any right to backpay or at least a right to any awarded until after expiration of five days from the date on which the striker(s) actually reported for work;

(4) Whether the Employer, in the absence of any proof he would not have granted interim quarterly wage increases but for strike-caused absences, must credit reinstated strikers with two such periodic pay hikes otherwise routinely made in the past "with a high degree of regularity" to eligible employees;

(5) Whether the Employer with a work-cycle rather than work-week method of production operation, with a number of legitimate business reasons for maintaining an employment complement of approximately 165, and with economic justification for holding overtime to a minimum must *necessarily* reduce his post-strike work force to its 142 man pre-strike annual average by discharging retained striker replacements (and by implication not make any post-strike "new hires" inflating the 142 man pre-strike force) in order to grant returning strikers "full" reinstatement, namely, *guarantee* them substantially equivalent average post-strike overtime work opportunities as enjoyed during a "representative" pre-strike quarter selected arbitrarily by General Counsel;

(6) Whether the backpay liability of the Employer, whose cycles of operation are ascertainable, should be computed on the basis of available hours of work during the actual discrimination period or on the basis of some arbitrarily selected "representative period," namely, the last full quarter immediately preceding the strike.

## I.

We note at the outset that the policy of the Act is to restore the situation as nearly as possible to *status quo*

---

as to warrant the conclusion that the striking employees would have received them absent unusual or special circumstances. I so find. Respondent does not assert that any particular striker would not have received a raise because of unusual or special circumstances."

Applying a but-for test, the Trial Examiner concluded that disqualification only because of absence during an unfair labor practice strike would permit the Employer to profit by his wrongdoing. He then determined that all eligible strik-

ers should be credited with the interim raises until they reached their maximum rate or were terminated. (R. 17–19.) After correcting two inadvertent clerical errors, the Board adopted the Trial Examiner's finding as its own. (R. 62.)

7. This Board figure, it should be noted, is also over $47,600 greater than the original backpay specification issued by the General Counsel's Regional Office and discarded by the General Counsel's Washington Office before the hearing date. *See* discussion thereof, *infra*, Part II.

*ante* the unfair labor practice. Phelps Dodge Corp. v. NLRB, 1941, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271. Accord: NLRB v. Strong d/b/a Strong Roofing & Insulating Co., 1969, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546. Such a purpose requires that those deprived of a recognized and protected interest by violations of the Act should be made whole so as to prevent the violator from profiting from his misdeeds. NLRB v. Coats & Clark, Inc., 5 Cir. 1957, 241 F. 2d 556; NLRB v. J. H. Rutter-Rex Mfg. Co., 5 Cir. 1957, 245 F.2d 594. We are aware that a backpay proceeding is designed to vindicate a public, not a private, right as to deter unfair labor practices; the employee is but a beneficiary. NLRB v. Mooney Aircraft, Inc., 5 Cir. 1966, 366 F.2d 809. Finally, the Act is *remedial*, not punitive, in its aims. *Cf.* Fanning, New and Novel Remedies for Unfair Labor Practices, 3 Ga.L.Rev. 256 (1969), 4 CCH Lab.Law Rep. ¶8042.

 Translated into practical standards in a reinstatement-backpay situation, the balance of the equities is as follows. The Employer is required to place the employee in the same position—with no more advantages and no fewer advantages—than before the discrimination against him for union activities. NLRB v. Goodyear Tire & Rubber Co. Retread Plant, 5 Cir. 1968, 394 F.2d 711, 714; NLRB v. American Steel Bldg. Co., 5 Cir. 1960, 278 F.2d 480, 482. Yet the reinstatement remedy must be adapted to economic-business conditions. NLRB v. R. C. Can Co., 5 Cir. 1964, 328 F.2d 974, 980; NLRB v. American Aggregate Co., 5 Cir. 1962, 305 F.2d 559, 563–565; NLRB v. Biscayne TV Corp., 5 Cir. 1961, 289 F.2d 338, 340; NLRB v. American Steel Bldg. Co., *supra.* *Cf.* General Electric Co., etc. v. NLRB, 5 Cir. 1968, 400 F.2d 713, 722–724, cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216.

 The Board, in a backpay proceeding, has the sole burden of proving employer liability for unlawful discrimination, with the Employer having the burden of coming forward with facts in mitigation. NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 576. Our role in review of a backpay proceeding has been recently restated in J. H. Rutter-Rex v. NLRB, 5 Cir. 1968, 399 F.2d 356, 359, cert. granted, 394 U.S. 1116, 89 S.Ct. 991, 22 L.Ed.2d 121, quoting from NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447, 451:

> "It is not the function of this Court to try the case de novo or to substitute its own appraisal of the evidence for that of the Board. If the Board has conceived the law correctly, if it has not acted arbitrarily or capriciously, and if its findings are supported by 'substantial evidence on the record considered as a whole,' they are conclusive and binding on this Court even though we might have made different findings upon an independent consideration of the same evidence."

*See also* NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (per curiam); Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Hence, we must determine whether the Board has made its backpay liability case upon "substantial evidence on the record considered as a whole"; and, if so, has the Employer's evidence in mitigation risen to a level justifying his action or commensurately reducing his liability. *See* NLRB v. Mastro Plastics Corp., 2 Cir. 1965, 354 F.2d 170, 175 n. 5 (burden of proving affirmative defense is on employer), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682; Nabors v. NLRB, 5 Cir. 1963, 323 F.2d 686, 690, cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609. *Cf.* 3 CCH Lab.Law Rep. ¶4770.

### II.

### *The Abortive Settlement: Punitive or Proper?*

On January 31, 1962, eight months after this Court enforced the Original Reinstatement Order, the General Counsel's Regional Office issued a $24,348.48 backpay specification and notice of a hearing to follow. The dollar figure

represented a sum due 87 strikers allegedly too tardily reinstated. The formula used as its basis the average weekly individual hours worked by the strikers during the four weeks immediately preceding the strikes. Inserting into the formula the individual delays between application and actual reinstatement, General Counsel was able to arrive at a reasonable "probable-working-hours-lost" figure to which he applied an adjusted wage rate to arrive at a dollar loss to each striker. The adjusted wage rate included an across-the-board pay increase granted all employees after the strike began and subtracted interim individual income from other jobs held during the strike. A substantial proportion of the over-all Employer obligation was traceable to eleven controverted "special cases," with the balance due approximately 80 returning strikers all of whom were reinstated within less than 90 days from the union application letter.

Employer and the Regional Office counsel agreed to compromise the "special cases" and executed a prehearing settlement for only $7,451.56, the sum due the approximately 80 already reinstated strikers. This settlement was rejected by General Counsel's Washington office, which then issued an amended backpay specification premised upon three entirely different theories resulting in a recomputation of liability at over $207,000.-00.

Employer contends that, pursuant to a mysterious memorandum prepared by Associate General Counsel for the Board,[8] Board Agent Whittaker informed the Employer that a settlement had to include certain of the special cases or the first specification would be enlarged. Employer then argues that his refusal to accept the coerced settlement was met with the amended specification over eight times the dollar liability of the original specification. Such, complains the Employer, was "punitive" and contrary to the Act's remedial purpose. Hence, Employer urges this Court to ignore the Board Supplemental Order and adopt, as the liability figure, either the original specification or, alternatively, the sum determined by the Trial Examiner.[9]

We cannot agree. This Court long ago held that Regional Office agreements constitute "merely preliminary negotiations" in no way binding on General Counsel who alone, under the Act is vested with final authority to bind the government by compromise or by settlement. NLRB v. Armstrong Tire & Rubber Co., 5 Cir. 1959, 263 F.2d 680, 682, rehearing denied, 265 F.2d 212. *See also* NLRB v. Local 2, United Assn. of Journeymen & Apprentice Plumbers, etc., 2 Cir. 1966, 360 F.2d 428, 435. Moreover, even as substantial an increase in a backpay specification as occurred in this case, in the absence of proof that the amendment was arbitrary or capricious, is clearly within the discretion of General Counsel so long as the amended specification is issued *before* the previously announced hearing date. 29 C.F.R. § 102.-57 (1969). Employer's requests for substitution of the original specification or

8. The gist of the memorandum was that no settlement not including full restitution for at least five specific claims among the eleven "special cases" would be acceptable; and unless these claims were included, the first backpay specification would be greatly enlarged. (S.R. 77–79.) All attempts by Employer to have the memorandum produced under discovery methods were fruitless. The Board, in its briefs, ignored whether any such memorandum existed and characterized Employer's contention on this issue as "highly colored and embellished." (Board Brief, pp. 45–47.)

9. The Trial Examiner, although presented with the amended specification and the different theories, arrived at $29,441.99 obligation due 84 strikers after rejecting one of General Counsel's theories. Since Employer notes the Trial Examiner's determination only exceeded the original specification by $5,093.51, that sum would apparently be preferred (even if based on allegedly erroneous theories) to the Board's liability figure in excess of $70,000.00.

the Trial Examiner's liability figure are, therefore, denied.

### III.

#### *Were Certain "Economic" Strikers Permanently Replaced?*

■ A strike over economic issues began on June 8, 1959. Not until June 30, 1959, did Employer's conduct transform the dispute into an unfair labor practice strike. It is undisputed that a number of striker replacements were hired between June 8 and June 30. Employer compiled several lists of strikers and alleged *permanent* replacements for them. These lists were extracted from payroll records and based largely on after-the-fact recollection by General Plant Superintendent Robinson. The lists reflect approximately 12 strikers,[10] most, if not all, of whom were ultimately reinstated without mention of the fact they were or might be considered "permanently replaced" in June 1959. According to Employer, these twelve have no right to backpay since they were permanently replaced economic strikers with no absolute right to reinstatement. By implication, Employer apparently believes that his actual reinstatement of these individuals was merely gratuitous.

■ We reject Employer's contentions because he simply has failed to show that twelve specific strikers were, in fact, permanently replaced before the economic dispute became an unfair labor practice strike.

Moreover, Employer, in the instant case, simply had no justification for tardy reinstatement. On the contrary, this Court earlier held that the 5-day delay allowed in the Board's Original Reinstatement Order was sufficient. Furthermore, the Employer has even defended himself against the "workweek differential" theory advanced by the Board by insisting that he was economically justified (almost compelled) to reinstate the strikers in order to maintain a 165-man "optimum" work force which allowed the Employer to legitimately reduce overtime and to concurrently reduce production from five to four weekly cycles. *See* discussion in Part VI, *infra.*

For this Court to deny backpay benefits to certain reinstated strikers, who were inconsistently and inconclusively enumerated as permanently replaced economic strikers, notwithstanding the Employer's own insistence that he was economically compelled to reinstate them in order to maintain an optimum work force level, would be for us to underwrite an unjustifiable Employer discriminatory action. *Cf.* General Electric Co. v. NLRB, 5 Cir. 1968, 400 F.2d 713, 722–

---

10. In his Answer to the Amended Specification, Employer listed 12 "permanently replaced" strikers by job classification, date replaced, and with replacement named. (S.R. 135, Appendix C.) By Amendment to his Answer, this list was withdrawn and 12 names of replaced strikers substituted. Only 8 of the second 12 appeared on the initial list. (R. 595–596.) During the actual backpay hearing, a third list was introduced as Employer's Exhibit 27. (S.R. 40; S.R. 109.) This list differed from that in the Amended Answer as to one name among the replaced strikers. All of the discrepancies were attempted to be explained away by Superintendent Robinson. (S.R. 31–51.) At one point, he admitted that he did not realize that the earlier lists were erroneous until within two weeks of the hearing. (S.R. 39.) He could not recall exactly when the earlier lists were compiled (S.R. 38), but he did acknowledge that "they called and got the information from me and it was intended to be as this [Exhibit 27] is now." The Trial Examiner rejected Employer's defense on two grounds: (1) By failure to notify reinstated employees at the time they were taken back that they had previously been permanently replaced, Employer waived his right to resurrect this defense, and (2) the Employer's course of conduct surrounding the various conflicting lists and explanations therefor indicated "uncertainty" as to the actual identity of the replaced strikers. Although the Board also found the "uncertainty" cumulative evidence of the fact the listed strikers were not permanently replaced, it primarily rejected the Employer's defense on grounds he failed to meet his burden of proving that any list was indicative of an intent to permanently replace the enumerated strikers.

724, cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216.

With one exception,[11] the names of the strikers enumerated in the various Employer lists of permanently replaced strikers appeared on the appended list accompanying the Union's request for unconditional reinstatement. Employer, in fact, reinstated these employees on the basis of his own economic requirements. No mention was made at such time that such reinstated strikers had waived any re-employment rights or had been permanently replaced. Employer has simply failed to meet his burden of proof. NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 576.

We, therefore, hold that the Board has more than adequately established a right to backpay inuring to each of the returning twelve strikers whom the Employer has attempted to disqualify, and this part of the Supplemental Order is enforced.

## IV.

### What is the Correct Backpay Liability Commencement Date?

In our original enforcement decision, we indicated that the Board order was not punitive when it established backpay liability as commencing "five (5) days after the date on which he applies for reinstatement * * *." 290 F.2d at 48 n. 1. The Trial Examiner, concluding that the Union letter requesting unconditional reinstatement for each striker named in a list appended thereto constituted "application" within the meaning of our decision, found that backpay liability commenced on December 17, 1959 (five days after the December 11 letter) for *all* returning strikers, timely and tardy reporters alike. The Board agreed with Employer that such an interpretation of the Original Order was unreasonable. Compromising, the Board held that

liability commenced on December 17 for those reporting as directed on December 19, while it began for tardy returners on the date on which they actually reported requesting reinstatement. In effect, the Board merely tolled liability with respect to the late returners. Individual claims were then computed on the basis of the delay between the applicable commencement date (December 17 or actual reporting date) and the actual reinstatement date.

Employer, however, asserts another theory: strikers not reporting on December 19, as directed in Employer's reply letter to the Union, should be considered to have waived forever any right to backpay. Alternatively, Employer contends that, even if he is required to pay tardy reporters, liability should commence as of actual reporting date plus five days. We cannot agree with either of Employer's theories.

As our enforcement decision clearly indicated, the practical problems, confusion and inefficiency caused by the necessity for unfair labor practice striker reinstatement is a "foreseeable 'direct by-product' of the employee's violation of the Act." 290 F.2d at 48. The Board Order imposed an obligation of full and immediate reinstatement within five days of the blanket application. The Union's letter requesting reinstatement for named individuals constituted effective application by an exclusive bargaining representative. Hence, the backpay liability unquestionably runs from a period five days after application until actual reinstatement. *See* NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447, 452 ("application" and "availability" are not the same). The Board quite correctly concluded, however, that those for whom application was made but who were unavailable for immediate employ-

11. Johnny Toombs' name appeared as one of the permanently replaced strikers in Employer's Exhibit 27 introduced in the backpay proceeding (S.R. 40; S.R. 109). The Trial Examiner noted, however, that "he was not included among those strikers in whose behalf the Union made an unconditional request for reinstatement." Further, he concluded, "there appears to be no evidence in the record as to when Toombs requested reinstatement after the strike." The General Counsel's allegation of backpay liability for Toombs was consequently dismissed. (R. 35.)

ment were not entitled to backpay until they became "available." The right to reinstatement, in the absence of business justification for denial following the termination of a strike (a situation not present in this case), "does not depend upon technicalities relating to application." NLRB v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 381, 88 S.Ct. 543, 19 L.Ed.2d 614. The Employer's duty to reinstate is a continuing one, under the *Fleetwood* rationale, at least for what here appears to be a reasonable reporting period. NLRB v. Mooney Aircraft, Inc., 5 Cir. 1966, 366 F.2d 809, 812. *See* NLRB v. Rice Lake Creamery Co., 1966, 124 U.S.App.D.C. 355, 365 F.2d 888, 890–891, cert. denied, Rice Lake Creamery Co. v. General Drivers & Helpers Union, 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65.

We conclude that the reinstated strikers are entitled to backpay for the period commencing either with the December 17 date for timely reporters or with the actual availability dates for tardy reporters (whichever is applicable) and terminating with the actual reinstatement date for each returning striker. This part of the Supplemental Order is, therefore, enforced.

## V.

### Should Interim Quarterly Wage Increases Accrue to Strikers?

Employer admitted a Company policy of granting quarterly wage increases of five cents an hour to employees who had not achieved the maximum job classification pay ceiling. However, Employer vigorously contends that these were *merit* increases awarded on the basis of "experience the employee gained every

three months." Employer further argues that "the reason the strikers did not get wage increases while they were on strike was because they were not gaining experience on their jobs." Moreover, noted Employer, "[t]he Company's treatment of strikers in regard to these increases did not differ in any respect from the treatment of other employees who were absent for various periods of time by reason of being sick, or injured, or in military service." [12]

On the other hand, General Counsel compiled elaborate statistical bases drawn from Employer's own records on which the government has premised its theory of recovery.[13] While the *precise* accuracy of these figures may be questionable, we agree with the Trial Examiner that quarterly raises for *eligible* employees "were given with such a high degree of regularity as to warrant the conclusion that the striking employees would have received them absent unusual or special circumstances." The evidence on the record considered as a whole is substantially in support of the Board's award of credit for the two quarterly increases to those employees otherwise eligible but for their strike absences. The "but-for" standard, supported by substantial evidence of award regularity during non-strike periods, is a legitimate and justifiable method of establishing the post-strike "going rate" of pay for returning strikers. *See* NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 572–573. *See also* NLRB v. Mooney Aircraft, Inc., 5 Cir. 1967, 375 F.2d 402, 403, cert. denied, 389 U.S. 859, 88 S.Ct. 104, 19 L.Ed.2d 125; NLRB v. East Texas Steel Castings Co., 5 Cir. 1960, 281 F.2d 686; Republic Steel

---

12. The above testimony (S.R. 51–53) complemented by a single page exhibit listing four otherwise eligible employees who did not accrue interim increases due to absence (S.R. 115), represents Employer's only proffered or introduced evidence.

It might be noted, too, that Employer's denial of interim increases to returning servicemen may well be violative of Section 9 of the Universal Military Train-

ing and Service Act, as amended, 50 U.S. C.App. § 459 (1968). *See* Tilton v. Missouri Pac. R. Co., 1964, 376 U.S. 169, 180–181, 84 S.Ct. 595, 11 L.Ed.2d 590; Hatton v. Tabard Press Corp., 2 Cir. 1969, 406 F.2d 593. At best, it is a poor analogy on which to base an affirmative defense.

13. *See* note 6, *supra*, and accompanying text.

Corp. v. NLRB, 3 Cir. 1940, 114 F.2d 820, 821.

 Employer never asserted that any otherwise eligible striker would have been denied the applicable interim increases because of unusual or special circumstances, and he simply failed to meet his burden of showing as an affirmative defense that the quarterly raises were based on merit or experience. *See* NLRB v. Great Dane Trailers, 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027; Nabors v. NLRB, 5 Cir. 1963, 323 F.2d 686, 689–690, cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609; NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447, 454.

Therefore this part of the Supplemental Order is enforced.

## VI.

*Did Judicial Enforcement of Original Reinstatement Order Impose Upon Employer a Duty to Discharge Replacements or, Alternatively, Increase Backpay Compensatory Liability?*

 This is the most bitterly contested issue in the entire backpay proceeding.[13A] The Original Board Order, enforced by this Court, imposed the following affirmative duty on Employer:

"2(b). Upon application, offer immediate and *full reinstatement to their former or substantially equivalent positions, without prejudice to* their seniority or *other rights and privileges,* to all those employees who were on strike on or after June 30, 1959 * * *, *dismissing if necessary any* persons hired by the Respondent on or after June 30, 1959 * * *." (Emphasis added.)

290 F.2d 47, 48 n. 1.

General Counsel offered the following severely compressed evidence in support of his "workweek differential" theory:

(1) No striker replacements were discharged following the strike.[14]

(2) The average work force complement for the year preceding the strike was 142 employees, while the post-strike work force consisted of a high of 164 employees during the quarter immediately following the strike termination to a low of 145 men by December 1960.[15]

(3) Before the strike, employees averaged from 46.6 to 49.1 *weekly* work

---

13A. Shorn of the "workweek differential" theory, the Board's backpay liability assessment is substantially deflated from $71,979.78 to a figure approximating the $25,000.00 initial backpay specification assessed by the Regional Office only to be rejected and amended by the General Counsel's Washington Office. *See* note 9, *supra,* with Part II, *supra. See also* note 30, *infra.*

---

14. General Counsel's Exhibit 51 (R. 619) indicated the following replacement retention figures:

| Date | No. Still on Payroll | Date | No. Still on Payroll |
|---|---|---|---|
| 12/11/59 (end of strike) | 83 | 7/1/60 | 43 |
| 1/1/60 | 82 | 8/1/60 | 42 |
| 2/1/60 | 60 | 9/1/60 | 42 |
| 3/1/60 | 51 | 10/1/60 | 40 |
| 4/1/60 | 47 | 11/1/60 | 36 |
| 5/1/60 | 46 | 12/1/60 | 35 |
| 6/1/60 | 44 | 1/1/61 | 34 |

See Board Brief, p. 8–9 n. 8. The number of retained replacements gradually diminished through normal attrition as indicated above.

15. Board Brief, p. A–3, compiled from General Counsel's Exhibit 7. *See* notes 4 and 14, *supra.*

hours (computed on a quarterly basis), whereas after the strike, employees averaged only 35.4 to 40.5 quarterly computed *weekly* work hours.[16]

Ergo, concluded General Counsel, reduction in post-strike average *weekly* work hours (and elimination thereby of overtime pay) resulted from retention of striker replacements and amounted to Employer denial of "full reinstatement" to returning strikers in violation of the "dismissal if necessary" requirement of the enforced Board order.

On the other hand, Employer raised a number of affirmative defenses:

(1) The number of employees on the payroll could not have deprived the returning strikers of *hours per week* because the Company employed a *cycle per week* method of operation guaranteeing all employees at least 8 hours per cycle and gearing the number of cycles per week to production requirements. Hence, the number of cycles (or days) per week which were ultimately worked was determined solely by machine capacity and customer orders.[17]

(2) The Board determination that a 22-man work force increase resulted from striker replacement retention ignored the fact that *20 new employees* were hired *after* the strike was over. These "new hires" are responsible for the work force post-strike inflation.[18] Neither striker rights nor the enforced Board Order barred the Company from hiring new employees after the strike.

(3) There were sound business reasons for maintaining an "optimum" work force of approximately 165 employees: Plant Manager Williamson did not know how many strikers would return since they straggled back over a 90-day period, normal vacation absences (including those due strikers) could be covered by retaining a larger work force, attrition in the low-skill field was normally high, and, normal absences for illness and injury could be offset. Employer offered extensive evidence in support of his business justifications.[19]

(4) Employer established a longstanding Company objective of reducing overtime in order to save labor costs. Three factors were noted as necessitating overtime notwithstanding the Company policy: (a) customer demand, (b) equipment failure, and (c) personnel shortage.[20]

(5) Employer operations are departmentalized so that work accomplished by one department cannot deprive an employee assigned to another department of any potential work hours.[21]

(6) Finally, Employer notes that "full reinstatement" does not necessitate guaranteed pre-strike overtime pay levels for returning strikers. He notes that all employees worked a total of approximately 6500 production hours before the strike, while all employees worked only about 6,000 hours per week after the strike. He observes:

"We are not talking about 500 hours per week done by strike replacements that strikers should have been permitted to do; we are talking about 500 hours work not done by anyone."

And he adds that a guarantee of pre-strike hours of work would result in an average premium of over six hours per returning striker for work that never

---

16. *See* note 5, *supra*, with accompanying text; *see also* Board Brief, p. A–3 compiled from General Counsel's Exhibit No. 7.

17. R. 22–25; S.R. 5–27, 54–61, 67–69.

18. S.R. 90. List containing 20 "new hires." Employer Exhibit No. 13.

19. R. 26–27; S.R. 5, 27–31, 54, 62, 74–76, 123. *See* Employer Brief, Appendices A through F compiled from Employer Exhibits 13 through 16, 18, 22, 27–28, 30, 32, 34 through 41, 41(a)1 through 41(a)146, 71, and 71a and representing a detailed analysis of Company operation, production and personnel policy.

20. S.R. 14–20, 58–62. *See also* S.R. 84–89, 104.

21. *See* Employer Brief, Appendices B through F and p. 18–20 n. 8, which identify department personnel assignments and organizational structure.

was performed by anyone during the discrimination period.[22]

The Trial Examiner credited the testimony of Employer's General Manager Williamson and Plant Superintendent Robinson and found that all employees worked eight or more hours each day that the plant was operating, that (assuming an adequate work force) cycles of production are determined by orders on hand and molding machine capacity and that replacement retention did not affect returning strikers' work opportunities. He also found that retention of replacements may have deprived strikers of some overtime computed against pre-strike averages, but he noted that the Company had established a credible economic policy of reducing overtime whenever possible. He then concluded that the Act did not guarantee any particular amount of overtime, and he rejected General Counsel's statistical argument that the presence of replacements deprived strikers of hours of work they would otherwise have earned and to which they were lawfully entitled. The Board disagreed and adopted the "workweek differential" theory, reasoning:

"To comply with the judicially enforced Board's Order that the unfair labor practice strikers be reinstated upon application [employer] is re-quired, absent special circumstances, to restore the strikers to their pre-strike jobs *under the same terms and conditions of employment as existed prior to the strike,* even if replacements have to be discharged. *It is axiomatic that the [employer] must also return them to the same number of hours of work, as they worked before they went out on strike,* for to do less would be to penalize them for exercising their statutory right to strike." [23]

Before this Court seeking enforcement of its Supplemental Order, including the "workweek differential" theory, the Board framed the issue as follows:

"What we are arguing about here is whether the Company could properly take advantage of that inflation in its employee complement (derived from retention of the replacements and reinstatement of the striker-reapplicants thus increasing by 22 over the pre-strike workforce average) to save itself money on overtime by reducing the individual paychecks of returned unfair labor practice strikers." [24]

For a number of reasons, we conclude that there is not substantial evidence on the record considered as a whole to support the Board's adoption of the "workweek differential" theory. Moreover, even if the Board had made out a prima

---

22. *See* Employer Brief, p. 23; *see also* R. 21–22.

23. R. 53. The Board relies on NLRB v. Mooney Aircraft, Inc., 5 Cir. 1962, 310 F.2d 565; NLRB v. Kohler Co., 1965, 122 U.S.App.D.C. 101, 351 F.2d 798; and NLRB v. Giannasca, 2 Cir. 1941, 119 F.2d 756, 135 A.L.R. 560. The Board summarized its argument in a nutshell in several excerpts in its Supplemental Memorandum, requested by this Court at the close of oral argument. It noted:

"In its simplest form, the Company's argument [that replacement retention could not deprive returning strikers of any 'hours'] amounts to defining 'straight-time hours' as 8 hours in any single work day. Although the definition may have validity in other contexts, it does not come to grips with the problem presented here: namely, that the strikers received, on the average, less than 40 hours a week in most of 1960.

Whether the Company achieved this by scheduling fewer hours per day or fewer days per week does not alter the impact on the returned strikers who found their pay checks substantially reduced when they returned to work after the strike."
Board Supp.Memo, p. 17 n. 17. It later made a conclusive assumption:

"Given a manpower situation like the one admittedly existing at the Company's foundry, where more employees could be effectively added to the production process, the retention of striker replacements obviously helps to speed work per day and so to make possible the completion of the available work in fewer days. This is not to disavow the Company's production needs as a factor in the number of cycles worked per week; it is simply to say that the size of the work force is another factor."
Board Supp.Memo, p. 21.

24. Board Supp.Memo, p. 22.

facie case based upon credible statistics, we agree with the Trial Examiner that Employer has met his burden to show an affirmative defense to such a Board remedial order.

No one contests that the Board established that certain striker replacements were retained. Hence, the Board's major premise is unassailable. On the other hand, the minor premises, namely, that the 164-man initial post-strike work force was inflated over the 145-man pre-strike average complement by the presence of retained strikers and that post-strike and pre-strike average weekly hours of work were determinable by work force size, are false.

Employer conclusively showed that at least 20 "new hires" occurred *after* the strike termination and contemporaneous with or subsequent to reinstatement of returning strikers. The Board's 164-man figure, excluding "new hires," thereupon shrinks to 144, or only two men above the pre-strike average force size.

Employer clearly proved that his method of operation was characteristic of the industry: cyclical production (with a cycle consuming a substantial part of a 24-hour day) determined by machine capacity and customer orders. Moreover, the operation is departmentalized and work schedules staggered in accordance with respective department tasks along the production process. The Board application of mere average weekly hours of work before and after the strike is wholly alien to Employer's time and production system.

With the Board's minor premises negated, the "logical" conclusion that replacement retention caused average weekly work hour availability to decrease is unsupportable.

The cases relied upon by the Board [25] are inapposite. *Giannasca, supra* n. 23, involved pay reductions made intentionally to level labor costs and still retain replacements after striker reinstatement. *Kohler* involved a promise made to replacements that they would be retained even if strikers were ultimately reinstated. *Mooney* is distinguishable because it simply involved, at the enforcement stage, a purely procedural decision pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e) (1964). In the instant case, returning strikers were reinstated fully and were eligible to work as many cycles as the plant was in production. Machine capacity and customer orders, in the instant case, controlled work cycles and a larger work force (since departmentalized) could not affect production. Within the parameters of this case, the personnel factor simply did not increase or decrease the number of cycles per week.

The Board's Supplemental Order, insofar as it adopts a "workweek differential" liability determination, is simply not supported by substantial evidence on the record considered as a whole in light of the affirmative defense established by Employer.[25A] See J. H. Rutter-Rex v. NLRB, 5 Cir. 1968, 399 F.2d 356, cert. granted, 394 U.S. 1116, 89 S.Ct. 991, 22 L.Ed.2d 121; NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447, 451. See also NLRB v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 576; NLRB v. Mastro Plastics Corp., 2 Cir. 1965, 354 F.2d 170, 175, cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682.[26]

---

25. *See* note 23, *supra*.

25A. Since the elimination of the "workweek differential" theory has no impact upon any other aspect of the backpay liability computation problem, the denial of enforcement of this portion of the supplemental award will altogether eliminate this "isolated" theory from further consideration in the mathematical computation to be performed on remand under the enforced theories. The "workweek differential" theory is, in effect, eliminated from this backpay liability case, and it may not be reexamined on remand. *See* Part VII, *infra*.

26. We are not unmindful that "[i]t is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of em-

For the foregoing reasons, we deny enforcement to the "workweek differential" liability determination.

## VII.

*What is the Appropriate Backpay Formula?*

Excluding the "workweek differential" liability determination, the Board has established and Employer has failed to affirmatively mitigate backpay liability as follows:

(1) For tardy reinstatement for 82 unfair labor practice strikers,[27]

(2) For interim quarterly wage increases, where applicable.

We do not believe that it should have been necessary to adopt some "representative" period upon which to compute what hours the returning strikers would have worked had they been reinstated immediately upon reporting.[28] Time lost due to tardy reinstatement would appear to be readily determinable for the actual discrimination period for each striker: How many days (cycles) was the plant in operation between the applicable commencement date and the actual reinstatement date for each striker and how many hours was the respective striker's plant department at work during each day.[29]

---

ployee rights in light of the Act and its policy.'" NLRB v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614. *Accord*: General Electric Co., etc. v. NLRB, 5 Cir. 1968, 400 F.2d 713, 724, cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216. Nevertheless, we are aware of no "right" to overtime or the same number of hours of work guaranteed by the Act or its policy in the face of affirmative economic justification for an Employer action not otherwise discriminatory. (*Compare* TXD at R. 24–25, *with* Board Decision at R. 53.) The Board has simply created an implicit legal right, assumingly stemming from Section 7 of the Act, 29 U.S.C. § 157, but actually based on an erroneous construction of the Act.

27. *See* Part IV, *supra*. It must be emphasized that, after eliminating the "workweek differential" theory, we are considering *actual* tardy reinstatement periods of no more than from one to nine weeks, depending upon the particular returning striker involved. All strikers covered by the Board's backpay order reported available for work on or after December 19, 1959; and all were, in fact, reinstated before the end of February 1960. (*See* Board Brief, p. 6.)

This tardy reinstatement figure also includes Board resolution of the eleven "special cases." The Trial Examiner found for General Counsel, with modifications, as to eight of these cases. (R. 27–38). The Board disagreed with the Trial Examiner as to three of the eight; liability with respect to two was eliminated altogether, while liability to one was reduced in amount. We conclude

that the Board resolution of these individual cases was correct so far as it recognized backpay due them for tardy reinstatement or interim quarterly wage increase adjustments. As with the remaining strikers, no "workweek differential" award shall be allowed any "special case" striker.

28. Where the backpay liability bases cannot be established precisely, the Board is only required to employ a formula reasonably designed to produce approximate awards due. NLRB v. Local 138, Inter. Union of Operating Engineers, 2 Cir. 1967, 380 F.2d 244, 250; NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447, 452; NLRB v. East Texas Steel Castings Co., 5 Cir. 1958, 255 F.2d 284; NLRB v. Kartarik, Inc., 8 Cir. 1955, 227 F.2d 190. *See* Buncher v. NLRB, 3 Cir. 1969, 405 F.2d 787 (en banc); NLRB v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 365 F.2d 888, 891, cert. denied, Rice Lake Creamery Co. v. General Drivers & Helpers Union, 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65. *See generally* NLRB v. Seven-Up Bottling Co. of Miami, Inc., 1953, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377.

29. The actual formula should be:
(1) What was the *actual* discrimination period for each returning striker (commencement to actual reinstatement calendar dates)?
(2) During this period, how many *actual* days (cycles) was the plant in operation?
(3) For each *actual* operating day (cycle) during which each returning striker was precluded from working,

We, therefore, remand the case to the Board for appropriate award computations for the 82 strikers due for tardy reinstatement and denial of interim wage increases.

## EPILOGUE

While we cannot fault the Board for its zealousness in attempting to secure such backpay awards as it believed were due these 82 individual returning strikers, including the propriety of advancing a theory which ultimately fails, neither can we fail in concluding to point out the unfortunate delay (over nine years between the period of discrimination and final payment of the awards) in resolution of this backpay liability case which has occurred because of what seems to us unnecessarily wide variations in theories of liability,[30] especially from a factual standpoint or, more accurately, the absence of a factual basis.

Enforced in part; enforcement denied in part; remanded for computation of awards in accordance herewith.

how many hours (over the normal company policy of eight hours guaranteed per cycle) was each returning striker's respective department on the job?

The actual number of hours a returning striker's department worked, including time over the minimum eight-hour guarantee, multiplied by the number of actual days (cycles) the plant was in operation during a respective striker's discrimination period will give the factor (hours) to be multiplied by *his appropriate hourly pay rate,* including whenever applicable interim wage increase credits, to determine individual dollar amounts due each tardily reinstated striker. In light of the fact that *actual* discrimination periods for individual strikers varied only from one to nine weeks, and taking into consideration the uncontroverted four-day-cycle production workweeks and eight-hour day guarantee (with some overtime on certain heavy production day-cycles), a maximum backpay ceiling would appear to be approximately 288 hours (plus specific overtime credits) for even those returning strikers delayed the full nine weeks. However, final backpay awards will necessitate *computation on an individual striker basis.* The results, excluding Board adjustments to the "special cases," should most likely approximate a final figure several thousand dollars below the Trial Examiner's Decision.

---

30. The disparity is obvious:
 Original backpay specification ............................$ 24,348.48
 *Compromise settlement (abortive)* .........................$ 7,451.56
 Amended specification ......................................$207,000.00
 Trial Examiner's Decision (excluding the "workweek differential" theory, but including three "special cases" eliminated or modified by the Board) ............................$ 29,441.99
 Board Order (reinstating "workweek differential"; modifying "special cases") ......................................$ 71,979.78
 Enforcement Order (eliminating "workweek differential"; affirming remainder of Board Order) ...........(approx.) $ 25,000.00