NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RICE LAKE CREAMERY COMPANY,
Respondent.

No. 16505.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 12, 1966.

Decided June 8, 1966.

Mr. Martin Ganzglass, Atty. N. L. R. B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for petitioner. Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., was on petitioner's motion. Mr. Paul Elkind, Atty., N. L. R. B., also entered an appearance for petitioner.

Mr. O. S. Hoebreckx, Milwaukee, Wis., for respondent.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and FAHY, Circuit Judge.

FAHY, Circuit Judge:

This is a petition for enforcement of a Supplemental Decision and Order of the National Labor Relations Board fixing back pay and ordering respondent to offer immediate and full reinstatement, as a group, to certain named employees.[1] 151 NLRB No. 105.

A strike by some 25 employees of respondent Company began June 22, 1958. The Board found that it was in protest of the unfair labor practice of the Company in refusing to bargain in good faith. On December 22, 1958, the strikers unconditionally offered to return to work, but the Company refused to accept them.

This Supplemental Decision and Order computes the sums to make the strikers whole for loss of pay. The amount is calculated for all strikers from December 23, 1958, to the date the Company offered reinstatement to some in June, July and August, 1962. The Board also found that the 16 then available for reinstatement, out of the original 25 strikers, are entitled to additional back pay until they are actually reinstated under the present order. The Board based this on findings

---

1. See General Drivers and Helpers Union, Local 662 v. N.L.R.B., 112 U.S.App.D.C. 323, 302 F.2d 908, cert. denied, Rice Lake Creamery Co. v. General Drivers and Helpers Union, Local 662, 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65, for the prior history of this case.

that the offers in June, July and August of 1962 were not in good faith and that these offers were rejected by the 16 employees for that reason. The other nine strikers were either no longer available for employment by the Company or were not interested in reinstatement.

The Supplemental Decision and Order has two parts. The first deals with back pay and the second requires reinstatement of the sixteen discriminatees as a group.

## I

■ The Company advances a broad objection that the formula used in computing gross back pay is unsound. It consisted of taking the average number of straight time and overtime hours worked by all full-time employees who performed production work during the back pay period and multiplying this average by the appropriate hourly wage rate for each discriminatee. This formula may not reach the exactly correct figure, but there is no suggestion of a formula that could, since the discriminatees did not actually work during the period. The formula used is a reasonable and legal basis for computation of gross amounts, and has had approval in court decisions. NLRB v. Brown & Root, Inc., 311 F.2d 447 (8th Cir.); NLRB v. East Texas Steel Castings Co., 255 F.2d 284 (5th Cir.).

■ We also find no adequate reason for requiring the Board to use a basis other than it did in averaging the number of straight time and overtime hours worked by those employees who did production work during each quarter of the back pay period. NLRB v. Brown & Root, Inc., *supra.* The approximation thus reached is permissible in view of the impossibility of exactitude. The seniority of the men involved supports the Board in finding that work would have been available not withstanding changes in equipment.

■ The Company advances a number of objections to the results reached in individual cases. It says, correctly, that Harry DeBoer was a maintenance man,

not a production worker. He was also the Union's steward in the plant before the strike. His back pay was computed on the basis of the average number of hours he worked during the six calendar quarters preceding the strike. We accept this effort of the Examiner and the Board to arrive at an approximation on some reasonable basis in the absence of any evidence or argument which indicates that the result is significantly wide of the mark sought to be reached; and we accept the finding that the job had not been eliminated. Maintenance work continued to be necessary during the period of the strike.

■ As to discriminatee Carl Wicken, however, our view conforms with that of the dissenting Board member. He concluded that Wicken's claim as allowed was erroneous because he removed himself from the labor market by moving to Seattle to be with his daughter there. The evidence as a whole we think does not support a contrary position. Wicken testified that his going to Seattle "was more personal because of my daughter living there * * *," that he left Rice Lake to be near her; "She could use the help." See Mastro Plastics Corp., 145 NLRB 1710, enforced, NLRB v. Mastro Plastics Corp., 354 F.2d 170 (2d Cir.).

■ The Company also objects to the award to Malcolm Demers and Basil Colbert, because they failed to appear at the supplemental hearing where the back pay data was adduced. The award to Demers is calculated only from the "date of discrimination until April 9, 1960" when he became no longer available for employment because, according to the Examiner, he was then imprisoned for a crime. We think the amount should be held in escrow until the discriminatee can be produced to testify, or some other method adopted to enable the Company adequately to inquire of him about matters which might mitigate the amount, if any, due to him, failing in which within a reasonable time the award must be disallowed. In this ruling we follow the reasoning of the Court of Appeals for the Second Circuit in NLRB v. Mastro Plastics Cor-

poration, *supra.* The Board there had required certain awards to be placed in escrow "to afford the respondent [employer] a reasonable opportunity to examine these claimants." One of the employees within this ruling did not come forward to testify. The Board nevertheless made the award to him. The Court held that while the burden of alleging and proving the unavailability of jobs, and the burden of persuasion as to willful loss of earnings, remained on the employer, the General Counsel had the burden of producing testimony by each available discriminatee that such willful loss of earnings was not incurred.

> * * * information relevant to whether the discriminatees willfully incurred a loss of earnings is within the knowledge of the discriminatees, not the employer. While the employer must raise this issue of mitigation of damages in its pleadings, it does not follow that the employer should be required to come forward with evidence by producing the discriminatees.
>
> * * * * * *
>
> Because the Board does customarily produce the discriminatees at back pay hearings, we conclude that a rule requiring a discriminatee to testify before his award becomes final is not an undue burden on the Board and would not undermine the efficacy of the back pay remedy.

354 F.2d at 177.

The foregoing escrow arrangement we think must also be applied to the award to Basil Colbert, since he did not appear at the enforcement hearing.

■ The Board approved the Examiner's conclusion that the discriminatees, in being made whole, were entitled to contributions the Company would have made to their pension insurance plan except for the discrimination. The amounts are not in dispute. Under the plan the Company pays an annual premium for the account of all eligible employees, that is, those with a five year record with respondent who apply to participate. During the strike the Company sought to have the policies transferred to the striking participants under a provision in the plan effective on termination of employment, and discontinued payments. A form of release was signed by some employees but most of the releases contained a caveat reserving rights under the Labor Act, and the Board concluded that as to those whose releases contained no such caveat, "the law is well settled that such private settlements to which the Board is not a party are not binding on the Board * * *." The sums the Company would have paid were in the nature of wages, although paid to the insurance carriers as premiums. Distinguishing this case from C. B. Cottrell & Sons Company, 34 NLRB 457, 474, where the Board had ordered the employer to restore the insurance rights themselves, the Examiner, with Board approval, reasoned that the amount of the premiums should be paid directly to the discriminatees since it was properly a part of their wages and therefore "a term or condition of employment" under Section 8(a) (3) of the Act. We think such a solution of the pension problem was within the competence of the Board.

■ Two employees, however, Malcolm Demers and Leonard Hanson, had not become eligible to participate in the plan before the strike began, and did not participate. We think no Company contribution should be included in the make-whole order as to them. The fact that all eligible employees had customarily participated does not obviate the fact that these two men did not. "The actual insurance coverage enjoyed by each of the strikers prior to the interruption of his employment by the strike is the proper measure of 'condition of employment' to the restoration of which he became entitled upon return to work." C. B. Cottrell & Sons Company, *supra* at 469 (Footnote omitted).

■ The discriminatees were covered by group medical and hospital insurance partly paid for by the Company and partly by the employee. The Company discontinued paying premiums for the striking employees. Their coverage was ter-

minated. Employees Delore King, Lloyd Madaus and Melvin Shervey incurred medical and hospital expenses which would have been covered by the insurance if in force. The amounts of expenses are not in dispute, nor is it disputed either that these employees made no contribution during the period when the expenses were incurred. The policy provided that the insurance should terminate in event the employment terminated and that cessation of active work on full time would constitute such termination. The Company also relies on a provision that persons eligible by reason of employment but who are not actively at work when they otherwise would be eligible would become eligible when they returned to active work. Since the discriminatees were not actively at work and did not contribute a part of the premiums the Company contends that none of the strikers qualified for the benefits, as the Board could not change the terms of the contract. The Board properly points out that this is not the question. The question is whether the hospital and medical expenses should be included to make these employees whole. Since they would have received the expenses except for the unfair labor practice, the loss is one which the Board validly included in the amounts required to make them whole, after deducting an amount equal to the premium the employee would have been required to pay. Since this latter amount in the cases of Shervey and Madaus exceeds the hospital and medical claims of these two employees, the Board properly disallows their medical and hospital expenses.

 The Company contends that the Board has unreasonably allocated all the risk of employee medical expenses to it but has allowed it to deduct premiums only as a set-off to actual claims. We agree that this is unreasonable. The Board has constituted the Company the insurer without allowing it to deduct from an employee's salary the equivalent of premium payments unless the employee makes a claim for medical expenses, and only to the extent of the claim. Insurance by its nature is the allocation of risk to minimize the burden on the individual. If the men are made whole as if uninsured they pay no premiums but may make no claim for medical expenses. However, if they are insured so they can make a claim for medical expenses, they should pay premiums whether or not such expenses are actually incurred; otherwise they would be unjustly enriched. If the Company is to be constituted an insurer it should be allowed to deduct the premiums. It is only then that the employees are "made whole," that is, put in the same situation as if they had not been deprived of their employment by an unfair labor practice. The Company accordingly should be allowed to offset the amount of the premiums against amounts due to all discriminatees if it is required to pay the claim of an employee to the extent his expenses exceeded his premiums.

 Strike benefits were paid to employees on strike during part of the strike, including payments to discriminatees. To qualify for the benefits they were expected to do some picketing. But, as the Examiner found, this was not an absolute requirement; some received benefits after the picketing terminated and the amounts were not entirely related to the hours of picketing. The Company contends these benefits were earnings which should be deducted from gross back pay. We would not be justified in disagreeing with the Board that the strike benefits in this case were collateral, "flowing from the association of the discriminatees with their union," and, therefore, not deductible like wages or earnings resulting from interim employment. See NLRB v. Brashear Freight Lines, 127 F.2d 198, 199 (8th Cir.). The matter was within the sound judgment of the Board to determine.

 The Company also contends that those who picketed were disqualified from back pay because while picketing they were not interested in securing interim employment. We agree with the Examiner and the Board that "the record does not disclose that the picketing pre-

vented any of the discriminatees from searching for or obtaining other employment." This was to be determined with respect to each employee considering the record as a whole, and not merely from the fact of picketing.[2]

## II.

■ The evidence that the offers in June, July and August, 1962, were not in good faith and were designed to deter acceptance is voluminous. It has been analyzed in detail by the Examiner, whose findings are largely accepted by the Board. We outline some of the reasons why we sustain these findings. The first offer of the Company was in June, 1962, while review of our decision by the Supreme Court was being sought. The offer was to only three employees, two of whom were DeBoer and Loren Hanson. This was followed by staggered offers in small groups over a period of weeks. Two of the first six employees, in two groups of three each, to whom offers were made, returned to work. They were subjected to such harassment and pressures, due unquestionably to their status as former strikers, as caused them, with reason, to quit work. Compare International Union, United A., A. & A. Imp. Wkrs., etc., v. NLRB, 120 U.S. App.D.C. 77, 344 F.2d 171. The last group offer, on August 17, 1962, included Russell Haugen. He went to the plant and advised management he was ready to return, but changed his mind overnight because, as he testified, he "would probably get the same sort of treatment" as the second one who had returned, who had had a hose turned on him. Evidence adduced as to the preparations for Hau-

gen's expected return support the finding that the Company "deliberately intended to make working conditions for (him) at its plant, difficult, if not unbearable."

No reinstatement offer followed promptly upon entry of our previous decree. We granted stays pending disposition by the Supreme Court of the Company's petition for writ of certiorari. The stays expired August 16, 1962. Not being required in the meantime, by reason of the stays, to offer immediate reinstatement the Company resorted to the staggered offers to small groups. This no doubt had the motive of lessening back pay should the Supreme Court uphold our decree, but the pattern also supports the Board view that the Company was seeking to avoid compliance with our decree as entered. The Company's explanations do not persuade us that the finding of lack of good faith is without substantial support in the evidence as a whole. It is undisputed that when our decree was entered the Company had given jobs to at least 20 employees after the strike began who were subject to dismissal if necessary to make room for the discriminatees the Board ordered reinstated. We consider hereinafter the provision of the Board's order that the sixteen employees be offered reinstatement as a group.[3]

## III.

Clearly, as to DeBoer and Loren Hanson, whose individual cases we have discussed, the order requiring offers of reinstatement and continued back pay must be sustained as appropriate to "effectuate the policies of the Act."[4] Fourteen oth-

2. The picketing here involved was subsequent to the Company's refusal of the discriminatees' request to be reemployed in December 1958.

3. The sixteen are Peter Butzler, Harry DeBoer, Wesley Derousseau, Benjamin Dudei, Otto Fetkenheurer, Leonard Hanson, Loren Hanson, Russell Haugen, Forest, Hineline, Delore King, Clayton Krogstad, James Lee, Lloyd Madaus, Harry Thibideau, Ernest Vreeland, and Howard Waterhouse.

4. Russell Haugen, as we explained earlier, reported to the Company and advised it that he would return to work. However, he changed his mind that night, because, so he later explained, he feared mistreatment. I would include Russell Haugen in the order requiring a new offer of reinstatement and continued back pay. But Judge Bazelon and Judge Edgerton conclude that his case is not distinguishable from the 13 other discriminatees whose reinstatement and con-

er discriminatees are affected by the order requiring group reinstatement and continuing back pay. Each of these employees received during the period June 24, 1962, to August 17, 1962, a letter from the Company signed by its President, as follows:

The Rice Lake Creamery Company has decided to offer you reemployment at your former position or a position substantially equal to the job held by you prior to the strike. Would you please report to me or to Mr. Raymond Gerland within five days of receipt of this letter for assignment. If you do not report within that period, we will assume that you are not interested in reinstatement.

The adequacy of this form of offer has not been contested.

Mr. Dudei responded accepting the offer but stating that he could not return to work within five days because he would have to put his affairs in shape to enable him to go back to work. He asked that the position be kept open for him and said he would report at an early date. There is no evidence that he or any one on his behalf pursued the matter further.

Mr. Fetkenheurer reported that he was unable to accept at the time due to circumstances beyond his control but would consider the offer at an early date. This appears to be all that occurred with respect to him.

Mr. Hineline replied that he would gladly accept but needed a little time, explaining why. He said he was trying to find a replacement in his present work so he could report to the Company for work and would notify the Company at his first opportunity. Nothing more appears.

Mr. Leonard Hanson replied that he was unable to accept the offer at the time but would consider it at a future date and appears not to have done so insofar as any contact with the Company is concerned.

Mr. King replied that after careful deliberation he had come to the conclusion he could not accept the offer at that time, July 18, 1962. Nothing more appears.

Mr. Krogstad replied that he had bought a grocery store which he could not dispose of in five days but he would try to find someone to take his place to enable him to report to work and hoped that to be soon. This appears to be all.

Mr. Thibideau replied that he was not able to report at the time, August 14, but would report for work just as soon as he was able to. He appears to have done nothing further.

Mr. Madaus acknowledged receipt, said he was referring the letter to the NLRB office, and would act upon their advice. This is all.

Mr. Waterhouse replied that due to the situations which have been created by the extended waiting period of four years, he could not accept at that time. This is all.

Mr. Lee replied that since he was presently employed he would need a reasonable time to give notice and make arrangements to relocate his family in Rice Lake. "So I will need more time before reporting to work at the creamery." The letter was sent from Burlington, Wisconsin.

Mr. Derousseau wrote to the Company: "I am unable to report for work at the present time, but at a later date will report for work." However, he never made any effort to report.

Mr. Vreeland sent a reply letter stating: "Due to circumstances beyond my control I am not reporting at this time, but I will report at a later date." He did not communicate further.

The Examiner found that Mr. Butzler rejected the offer by respondent since it was not in good faith. This contradicts another finding that the Company rejected Butzler's `conditional acceptance

tinuing back pay we are also remanding. No threats were made to him by the Company during their conference. He

never notified the Company of his decision or his reasons for it.

and is inconsistent with the clear language of Butzler's reply: "I am willing to return to work and this letter is intended as my acceptance. However, I cannot return to work within five days * * * I will try to have my affairs in shape so I can report to you for employment. I trust you will keep the offer open for me and will be notified at my earliest convenience." This letter calls for no assurance by the Company. It contemplates Butzler taking the next step. He never did.

When the enforcement hearing was held beginning in May, 1963, various reasons were given why these employees did no more. The testimony concentrated on a belief attributed to the men that the offers were not in good faith. This testimony was voiced at the hearing in 1963, and must be compared with the written replies above set forth. None of the fourteen men tested the offers at or about the time they were made, or then took the position the offers were not in good faith, either personally or through the Union so far as appears. The record as a whole, which we must consider, could reasonably have led the Company to believe that each of these men would take some further step if reinstatement were desired.

■ The failure to do so, and the written record they left as to their attitude contemporaneous with their offers, raise a question whether the policies of the act would be effectuated by requiring the Company to offer reinstatement and continued back pay for them. The fact that we sustain the Board's finding that the offers were not in good faith is not conclusive of the suitability of the remedies of continuing back pay and reinstatement.

■ We are unanimously of the view that the case should be remanded to the Board for reconsideration of the back pay provision of the order. We are aware of the settled law that it is the Board and not the courts to which Congress has left the principal responsibility for formulating orders to effectuate the policies of the Act. With respect to another agency the Supreme Court very recently discussed the standard of review in Labor Board cases and generally under Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e) (1961 ed.), saying:

> It frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute. These policies are particularly important when a court is asked to review an agency's fashioning of discretionary relief. [Footnotes omitted.]

Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620–621, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131.

This discussion of the Supreme Court precludes us from finally setting aside that part of the order now under consideration. But we think it does not preclude us from remanding it to the Board for further consideration. In *Consolo* the agency action upheld was the heart of the agency decision. Here, in contrast, the continuing back pay is not discussed by Examiner or Board. It is only casually mentioned, and then as a matter of course. The reasons for this part of the order are not adverted to or related to the record.

Precedent for our action can be found in Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 192–200, 61 S.Ct. 845, 85 L.Ed. 1271, where the Supreme Court remanded the case to the NLRB for an explanation of how the remedies chosen by the Board served the ends of national labor policy in the context of the facts of that case. While such a justification of the Board's choice of remedy might not be necessary or significant in most cases, what gives us pause here is the factual situation with respect to the Company's reinstatement offers and the written responses of the fourteen employees. We are also concerned by the danger that an after-the-fact determination into the motivations for the refusals of the reinstatement of-

fers is so prone to exaggerated and colored testimony. This is not to say one way or the other whether the Board's findings as to the men's motives were supported by substantial evidence. Rather, we think the Board's decision is defective in not explicitly justifying, in terms of the public policy of the Labor Act, how the remedy of continuing back pay would effectuate the goals of the Act. *Cf.* Burinskas v. N. L. R. B., 123 U.S.App.D.C. 143, 357 F.2d 822.

■ Judges Bazelon and Edgerton are of the opinion that the remedy of reinstatement should also be remanded to the Board for reconsideration because the Board ordered this remedy in the same automatic and unexplained fashion as back pay. In addition, they feel that the Board should be free, after its reconsideration of the propriety of continued back pay, to devise whatever remedy it thinks most appropriate, even if it does not include a reinstatement offer. I am of the opinion that the reinstatement provision following the offers which were not made in good faith needs no further explanation to bring it within the Board's authority to formulate orders to effectuate the policies of the Act. This part of the order rests upon conduct for which the Company must be held responsible. However, I join Judges Bazelon and Edgerton in ordering remand for reconsideration of the continuing back pay provision, for such provision in my view involves considerations of action and inaction of the employees and their Union as well as conduct of the Company, calling for an articulation, which the court can review, of the justification for the provision.

On remand we do not preclude consideration of a divided responsibility between the Company and the fourteen men affecting whatever amount, if any, should be awarded for back pay since the offers of reinstatement made in June, July and August, 1962. We wish to make clear, however, that this aspect of the remedy, as well as all others, is within the reviewable discretion of the Board and that we do not anticipate the results

of further consideration. We only ask that the Board articulate the reasons for whatever remedies it orders so that we may properly exercise our reviewing function.

We deem it unnecessary to discuss other contentions. The Order of the Board will be enforced, modified as we have indicated, and the case remanded in part as also indicated.

It is so ordered.