OIL, CHEMICAL AND ATOMIC WORK-
ERS INTERNATIONAL UNION,
AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Kansas Refined Helium Co., Intervenor.

No. 75–1065.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1976.

Decided June 28, 1976.

Rehearing Denied Aug. 2, 1976.

Certiorari Denied Jan. 25, 1977.   See
97 S.Ct. 823.

Jerry D. Anker, Washington, D. C., with whom Lawrence J. Sherman, Washington, D. C., was on the brief, for petitioner.

Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Jr., Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.

Marvin J. Martin, Wichita, Kan., with whom W. Stanley Churchill, Wichita, Kan., was on the brief, for intervenor.

Before McGOWAN, LEVENTHAL and WILKEY, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal presents yet another controversy in the seemingly endless litigation stemming from unfair labor practices committed in 1966 at the Kansas Refined Helium Company (KRH) plant in Otis, Kansas, of which George A. Angle is sole proprietor. Specifically at issue is whether, under the circumstances of this case, the refusal of three of the six illegally discharged employees to accept Angle's temporary offer of reinstatement, made pursuant to a court order, constitutes a willful loss of earnings.

I

In response to a union organizing effort in 1966 at the KRH plant, Angle "embarked upon an anti-union campaign marked by massive and systematic violations of the Act," including, *inter alia,* "coercive interviews with virtually every employee, threats of plant closure and discharge for union activity, and the discharge of 6 union supporters." *George A. Angle, d/b/a Kansas Refined Helium Co.,* 176 N.L.R.B. 1032 n. 4 (1969).

Following the filing of charges in September, 1966, and the issuance by the Board of a complaint, a proceeding was instituted in the United States District Court for the District of Kansas by the Board's Regional Director pursuant to Section 10(j) of the National Labor Relations Act.[1] On April 5, 1967 the District Court issued an injunction

---

1. 29 U.S.C. § 160(j) (1970) provides:

(j) The Board shall have power upon issuance of a complaint as provided in subsec-

tion (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United

ordering Angle to reinstate the six dischargees pending final disposition of the charges by the Board and to tender sufficient transportation costs to permit them to return to work. *Sacks v. Angle*, 65 L.R.R.M. 2098 (1967), *aff'd*, 382 F.2d 655 (10th Cir. 1967).

On April 25, following an unsuccessful attempt to stay the injunction, Angle made an offer of reinstatement to the six discriminatees:

> Judge Brown has now ruled that you are to be offered reinstatement to your former position pending the final determination of this matter by the Board; and that we are to pay transportation costs sufficient to enable you and your family to return to work, if you accept reinstatement to your former position pending the final determination of this matter by the Board.
>
> In order for the employees and their families to make their plans and in order for me to make the necessary arrangements regarding the present personnel at the KRH plant, and to expedite Judge Brown's temporary injunction, will you please let me know if you desire to return to work pending the final outcome of the KRH matter. If so, please calculate transportation costs sufficient to enable you and your family to return to work. In case you do not desire to return to work pending the final outcome of the KRH matter before the NLRB, it is not necessary that you calculate these trans-

portation costs. In either event, will you complete the attached information and return it to me in the enclosed envelope. App. 67, 69, 72. While both Harris and Johnson refused this offer from the outset—Johnson having relocated in Carrollton, Texas and Harris in Seattle, Washington—Bishop initially accepted. App. 10, 20 n. 10.

Following further correspondence, on June 9, 1967 Angle sent Bishop (along with Garrett and Rodgers, not parties to this appeal) a letter stating:

> In my last letter to you dated May 25, 1967, I told you I was going to the KRH plant. Following my return from the plant, I received a copy of an order from the NLRB indicating that the Union has withdrawn its request for an election and vacating the original order that an election should be held. A copy of this order is enclosed. In view of the effect which this new order by the NLRB would seem to have, our attorney has filed a request that the order of Temporary Injunction previously issued by Judge Brown in Wichita, also be vacated and dissolved. A copy of this motion is also enclosed. It is my understanding that two of you are employees and one has been self-employed in some connection with a family business. I am sending this information, since it appears these latest developments might affect your decision to disrupt the status that you have been in for over 8½ months to return to RKH on a temporary

States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

Section 10(j) was passed in recognition of the possibility that the purposes of the Act could be defeated through the delay between the filing of charges and the availability of a legally enforceable remedy. S.Rep.No.105, 80th Cong., 1st Sess. 27 (1947):

Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been unable in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act, the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the *status quo* pending litigation.

reinstatement basis set forth in the order of temporary injunction. I am also enclosing other proceedings since the court hearing in January since you were not present for these proceedings and may not have this information.

Would you please advise me at your earliest convenience as to whether or not you intend to accept the offer of temporary reinstatement at KRH under the temporary injunction order by Judge Brown in view of these new circumstances.

App. 76. After receiving this letter,[2] Bishop declined Angle's offer of temporary reinstatement.

On June 25, 1969, the Board found in the unfair labor practice proceeding that, *inter alia*, Angle had discriminated against Johnson, Bishop, and Harris in violation of sections 8(a)(1) and 8(a)(3) of the Act. *George A. Angle, d/b/a Kansas Refined Helium*

2. Included with it were the following enclosures:
   Motion, dated January 23, 1967, with Exhibit 1.
   Transcript of Hearing Held March 1, 1967.
   Order Granting Temporary Injunction, dated April 5, 1967.
   Memorandum, Findings of Fact and Conclusions of Law, dated April 5, 1967.
   Notice of Appeal, dated April 7, 1967.
   Motion to Stay Temporary Injunction Pending Appeal, dated April 7, 1967.
   William L. Whittaker, Clerk, letter dated May 1, 1967, setting Denver hearing for May 24, 1967.
   Transcript of Hearing held April 17, 1967.
   Order Vacating Decision and Direction of Election, Withdrawing Notice of Hearing, and Permitting Withdrawal of Petition, 5–31–67.
   Motion to Dissolve Injunction, dated June 1, 1967.
   App. 77.

3. The Board's supplemental decision might be thought to be ambiguous. It could be construed to mean either that (1) *an employer* has fully discharged any further backpay obligation *on his part* by extending an offer of temporary reinstatement pursuant to a section 10(j) order, or (2) that *the employees'* refusal to accept said offer constitutes a willful loss of earnings *on their part* sufficient to negate the employer's continuing backpay liability. Although the Board's decision could have been more clearly articulated, we believe that a fair reading necessarily leads to the conclusion that the Board relied on the willful loss of earnings doctrine.

*Co.*, 176 N.L.R.B. 1032 (1969), *enf'd, Oil, Chemical and Atomic Workers Int'l Union v. NLRB*, 144 U.S.App.D.C. 167, 445 F.2d 237 (1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972). The Board's decision included the customary reinstatement and make-whole remedial provisions. *See* 29 U.S.C. § 160(c) (1970).

In a supplemental proceeding to calculate the amount of backpay to which the illegally discharged employees were entitled, the Board ruled, with members Fanning and Jenkins dissenting, that the refusal of the employees to accept Angle's offer of temporary reinstatement constituted a willful loss of earnings sufficient to halt the accrual of Angle's backpay liability from the time of the extension of the offer. *Kansas Refined Helium Co.*, 215 N.L.R.B. No. 67 (Dec. 15, 1974).[3] It is this ruling that is now before us.

Our conclusion rests on four principal considerations:
(1) The Board formulated the issue presented in this case as follows:
[W]hether or not [the Respondent's] offers of reinstatement, made pursuant to an injunction obtained by the Board under Section 10(j) of the Act, were sufficient to impose a duty upon the discriminatees herein to either accept the offers or be guilty of a willful loss of interim earnings.
App. 5. The Board also characterized the Administrative Law Judge's decision as confronting this same issue:
The Administrative Law Judge found that, inasmuch as the offers were limited by the language of the court order, the discriminatees were not obligated to accept them. We disagree.
App. 5. In accordance with this view, much of the Board's decision focuses on whether the discriminatees, by rejecting the offer, had sustained a willful loss of earnings, rather than whether the employer, by extending the offer, had discharged his remedial obligation. App. 5.
(2) This view is further buttressed by prior Board decisions dealing with discharge by the employer of his remedial obligation during the course of litigation, which hold that a *full* and *unconditional* offer of reinstatement to the employee's former position is required. *Hydro-Dredge Accessory Co.*, 215 N.L.R.B. No. 5 (Dec. 1, 1974); *Anderson Plumbing and Heating Co.*, 203 N.L.R.B. 18 (1973); *Nevada Tank and Casing Co.*, 131 N.L.R.B. 1352, 1353 (1961); *see, e. g., NLRB v. Electric City Dyeing Co.*, 178 F.2d

## II

■ As a general rule, the amount of backpay awarded is the difference between what the employee would have earned but for the wrongful discharge and his actual interim earnings, *Heinrich Motors, Inc. v. NLRB*, 403 F.2d 145, 148 (2d Cir. 1968). However, the employer's backpay liability may be reduced if the employee incurs a "willful loss of earnings." *Phelps Dodge Corp. v. Labor Board*, 313 U.S. 177, 200, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The *Phelps Dodge* Court made it clear that the willful loss of earnings doctrine was adopted not so much to effect "the minimization of damages" but rather to encourage "the healthy policy of promoting production and employment." *Id.* at 200, 61 S.Ct. at 855.

■ The boundaries of the wilful loss of earnings doctrine have been defined in subsequent opinions. Backpay may be reduced to the extent that the employee "fails to remain in the labor market, refuses to accept substantially equivalent employment,

---

980, 983 (3rd Cir. 1950) (vague and conditional offer of reinstatement insufficient); *Florida Steel Corp.*, 214 N.L.R.B. No. 59 (Oct. 29, 1974); *Georgia Hosiery Mills*, 207 N.L.R.B. 781 (1973); *Sports Coach Corp. of America*, 203 N.L.R.B. 145 (1973) (conditioning employees' reinstatement on withdrawal of union support); *Ruston and Mercier Woodworking Co., Inc.*, 203 N.L.R.B. 123 (1973) (offering reinstatement as new hires); *Harvey Carlton d/b/a Cello-Tak Co.*, 143 N.L.R.B. 295, 304 (1963) (probationary reinstatement insufficient). Indeed, in this case the Board made no effort to equate Angle's offer with the traditional unconditional offer, stating instead that:

> Since Respondent's offers were temporary in nature, for the duration of the litigation, we would not find them to be substitutes for the normal, permanent offer required of employees to terminate final backpay liability for 8(a)(3) violations.

App. 6. If the Board's decision rested on the first of the two possible theories—that the employer's temporary offer of reinstatement discharged his backpay obligation—it would seem inconsistent with at least the spirit of these established cases. Were the Board to lay down so novel a proposition, we would surely expect the agency's opinion to reflect some awareness of that fact as well as a more precisely articulated view of the question. The lack of any such explanation, like the language of the decision itself, points toward interpreting the decision as not resting on the first theory suggested above.

(3) Under established Board practice, after a determination that an employee has been illegally discharged, the Board's order will require the employer to offer the employee reinstatement. If, however, the employer *pendente lite* extends an offer of unconditional and permanent reinstatement which is rejected by the employee, the employer is held to have discharged his remedial obligation, and the employee's status is altered from an illegal dischargee to an unfair labor practice striker. As such, he is entitled only to a Board order requiring the employer to reinstate him if he applies. *In the Matter of Hemp and Co. of Illinois*, 9 N.L.R.B. 449, 461–63 (1938); *accord*, *Anderson Plumbing and Heating Co.*, 203 N.L.R.B. 18, 19 (1973); *Spitzer Motor Sales, Inc.*, 102 N.L.R.B. 437, 453 (1953). If in the original proceeding in 1969 the Board had viewed Angle as having discharged his remedial obligation by having extended, *pendente lite*, the temporary reinstatement offer pursuant to the 10(j) order (the first theory suggested above), then the Board would only have ordered Angle to offer reinstatement *upon application*. Instead the order required Angle to offer reinstatement, thus implicitly rejecting any suggestion that Angle's temporary offer discharged his remedial obligation. And rather than indicating any disagreement with this implicit finding, the Board in the supplemental proceeding expressly noted that it would not find Angle's offers to be "substitutes for the normal permanent offer required of employers to terminate final backpay liability" and that Angle "offered unconditional permanent reinstatement to each of the discriminatees here involved, sufficient to satisfy its obligation under the terms of the Board and court orders." App. 6. Thus the Board has consistently treated the employees as having been illegally discharged, and in so doing has rejected any suggestion that Angle discharged his remedial obligation.

(4) If the Board's decision were construed to hold that a temporary offer of reinstatement on the part of an employer tolls backpay liability, this would discourage resort to the § 10(j) procedure. The Regional Director, interested in protecting employees where the employer is charged with being the offender, would realize that where success before the Board is likely, the employees would prefer that a § 10(j) order not be sought; for if, pursuant to a § 10(j) order, the employer offered temporary reinstatement, what was intended as a protective remedial provision, *see* note 1 *supra*, would instead have the peculiar effect of limiting the scope of the backpay remedy that would otherwise be available.

Therefore, we conclude that the Board's decision must be read to hold that the employees' rejection of Angle's offer constituted a willful loss of earnings.

fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason." *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 174 n. 3 (2d Cir. 1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); *accord, NLRB v. Madison Courier, Inc.*, 153 U.S. App.D.C. 232, 472 F.2d 1307, 1317 (1972). The burden of proving such willful loss of earnings is always upon the employer. *Id.* at 1318.

█ The discriminatee is merely required to make "reasonable efforts" to mitigate his loss of income, and only unjustified refusals to find or accept other employment are penalized under this rule. *NLRB v. Ardui-ni Mfg. Co.*, 394 F.2d 420, 422–23 (1st Cir. 1968); *Heinrich Motors, Inc. v. NLRB, supra*, 403 F.2d at 148–49: *NLRB v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 575 (5th Cir. 1966). An employee need not "seek employment which is not consonant with his particular skills, background, and experience," or "which involves conditions that are substantially more onerous 'than his previous position." *NLRB v. Madison Courier, Inc., supra*, 472 F.2d at 1320–21. He is not required to accept employment which is located an unreasonable distance from his home. *Id.* at 1314; *accord, e. g., Florence Printing Co. v. NLRB*, 376 F.2d 216, 220–21 (4th Cir. 1967), *cert. denied*, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 179 (2d Cir. 1965); *General Teamsters Local 439*, 194 N.L.R.B. 446, 451 (1971); *Nickey Chevrolet Sales, Inc.*, 160 N.L.R.B. 1279, 1280 (1966); *Oman Construction Co., Inc.*, 144 N.L.R.B. 1534, 1537–38 (1963); *American Bottling Co.*, 116 N.L.R.B. 1303

(1956). Efforts at mitigation need not be successful; all that is required is an "honest good faith effort," *NLRB v. Cashman Auto Co.*, 223 F.2d 832, 836 (1st Cir. 1955); *accord, NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103, 108 (7th Cir. 1974); *Golay & Co. v. NLRB*, 447 F.2d 290 (7th Cir. 1971); *Lloyd's Ornamental and Steel Fabricators, Inc.*, 211 N.L.R.B. 217 (1974).

Our task is to review the Board's application of these well-established principles to the supplemental decision and order of the Board in the present case.[4] The parties have stipulated as to all questions of backpay liability except the effect of the employees' rejection of Angle's offer of temporary reinstatement under the willful loss of earnings doctrine. *See* Exhs. 2A–2C, 3A–3C, App. 130–57. In properly applying this doctrine, the facts concerning each discriminatee must be considered separately. *NLRB v. Madison Courier, supra*, 472 F.2d at 1318; *see NLRB v. Rice Lake Creamery Co.*, 124 U.S.App.D.C. 355, 365 F.2d 888, 894 (1966); *United States Air Conditioning Corp.*, 141 N.L.R.B. 1278, 1280 (1963).

█ At the time that Angle extended his temporary offer of reinstatement, both Johnson and Harris had left the community, moving several hundred miles away to secure employment. Johnson had obtained work at the Johnson Service Company in Carrollton, Texas, and during the second quarter of 1967, up to the time of Angle's reinstatement offer, had earned $1,107.77 in his new job as opposed to the $804.95 he would have earned for this quarter at KRH.[5] Harris was employed by Boeing

4. While the Board, in its administration of the Act, has broad discretion in shaping remedies, we have held (in the context of a backpay case) that it "cannot act arbitrarily nor can it treat similar situations in dissimilar ways. The Board has a responsibility to administer the Act fairly and rationally." *Burinskas v. NLRB*, 123 U.S.App.D.C. 143, 357 F.2d 822, 827 (1966), *citing Melody Music, Inc. v. FCC*, 120 U.S.App. D.C. 241, 345 F.2d 730 (1965); *accord, e. g., Columbia Broadcasting System, Inc. v. FCC*, 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971); *Carnation Co. v. NLRB*, 429 F.2d 1130,

1134–35 (9th Cir. 1970); *NLRB v. WGOK, Inc.*, 384 F.2d 500, 503 (5th Cir. 1967).

5. Johnson finished that quarter with earnings totaling $2,637.54 at his Texas job compared to calculated earnings of $1,944.52 that he would have received at Angle's plant. Johnson earned more money per quarter at his new job in 18 of the possible 23 quarters of backpay liability than he would have earned working for Angle, and in several quarters significantly more:

Aircraft Company in Seattle, Washington. In the second quarter of 1967, up to the time of Angle's offer of reinstatement, he earned $1,977.84, compared with a calculated $1,077.09 total earnings for the same period had he worked for Angle.[6]

Therefore we are at a loss to understand the Board's decision that Johnson's and Harris's refusal to accept Angle's temporary offer of reinstatement constituted a willful loss of earnings when both men at the time of the offer were earning *more* money at their new jobs than they would have earned for a comparable period of time at KRH. If ever the public policy first enunciated by the *Phelps Dodge* Court of encouraging employment and productivity of workers was furthered, this is the case.

The Board in the instant case found that, since Angle carefully followed the court's order, "we see no reason not to give these offers of reinstatement the same status as any other valid, interim offer." App. 5. An unreasonable rejection of a valid, interim offer might in some circumstances constitute a willful loss of earnings. But even if Angle's offer were considered as such,[7] Johnson and Harris could both have refused the offer and not incurred a willful loss of earnings. Aside from the *temporary* character of the offer as opposed to their present permanent employment, and the fact that the offer paid *less* than their present employment and involved tension-filled working conditions, an employee is not required to accept employment at a great distance from his home. *See* p. —— of 178 U.S.App.D.C., p. 604 of 547 F.2d *supra.*[8] Acceptance of Angle's offer would involve a relocation of several hundred miles—the second such uprooting in a period of eight months.

Therefore, we find that Johnson and Harris did not incur a willful loss of earnings, as defined by existing NLRB doctrine, by their rejection of Angle's offer of temporary reinstatement. As members Fanning and Jenkins noted in dissent,

> [I]t would be unreasonable to require these men to abandon their permanent jobs and newly established lives, to return to an employer on a limited basis, at the risk of ultimately being without any employment and having to renew their residences at distant locations. . . . Johnson and Harris made substantial earnings during all four quarters of 1967. The public interest does not require more of them.

App. 9–10.

Bishop's situation is not as clear. At the time of Angle's offer of temporary reinstatement, Bishop was employed by Cessna Aircraft in Wichita, Kansas, approximately 100 miles from the KRH plant. His second quarter 1967 earnings preceding the offer

| Year/Quarter | KRH | Texas |
|---|---|---|
| 1969—3rd | $2,392.53 | $3,165.00 |
| 1970—4th | 2,210.13 | 3,049.54 |
| 1971—4th | 2,449.38 | 3,614.00 |

App. 141–43. Johnson's claim for backpay arises from the 5 quarters in which his interim earnings fell short of the sum he would have earned at KRH. It is standard Board practice to calculate backpay independently for each quarter. *NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *NLRB v. Rice Lake Creamery Co.,* 124 U.S. App.D.C. 355, 365 F.2d 888, 891 (1966); *NLRB v. Brown and Root, Inc.,* 311 F.2d 447, 452 (8th Cir. 1963).

**6.** Harris finished that quarter earning $3,596.08 at his Seattle job as opposed to a comparable $1,958.38 total earnings at the KRH plant. In 12 out of the 23 possible quarters of backpay liability, Harris earned more than he would

have earned working for Angle—on the average $400 or $500 more per quarter.

**7.** We have already noted that the purpose of § 10(j) might be undercut if a discharged employee's refusal of an offer of temporary reinstatement is found to constitute a willful loss of earnings. *See* the last paragraph of note 3 *supra.*

**8.** In *Florence Printing Co. v. NLRB, supra,* 376 F.2d at 221, Glenn Johnson received an offer of a *permanent* job at his trade in Rock Hill, South Carolina, one hundred miles from Florence. The court affirmed the Board's determination that Johnson's refusal to accept this offer did not constitute a forfeiture of his backpay reimbursement—the disruptive effect of the move and the necessity of selling his home, removing his child from school, and abandoning his native community were a sufficient basis for finding that his refusal was not unreasonable.

were $582.86 at his new job, compared to projected earnings of $857.89 at Angle's plant.[9]

Initially Bishop accepted Angle's April 25, 1967 offer. He then received Angle's June 9, 1967 letter (reproduced in its entirety at pp. ———— of 178 U.S.App.D.C., at pp. 600–601 of 547 F.2d *supra*) informing him that the Union had withdrawn its request for an election at KRH, that Angle's attorneys had filed for dissolution of the § 10 (j) injunction, and that Angle was so informing him "since it appears these latest developments might affect your decision to disrupt the status that you have been in for over eight and one-half months to return to KRH on a temporary reinstatement basis." Copies of papers in the pending legal proceedings were enclosed.[10] Clearly implicit in the June 9 letter was the message that the offer was to a temporary position and extended only for the life of the then-under-challenge § 10(j) order. Thus faced with the possibility that the injunction would soon be vacated and that Angle would discharge him for the second time, Bishop declined to return to KRH.

■ If Angle's temporary offer of reinstatement is treated, as the Board suggests, like any other valid interim offer, we find that Bishop was under no obligation to accept this offer. As noted above, an employee is only required to make *reasonable* efforts to obtain alternative employment. In Bishop's case he promptly sought and obtained interim employment. When Angle's offer was extended Bishop had to choose between a lower paying *permanent* job and a higher paying job with Angle which was so temporary in character that, if Angle succeeded in vacating the § 10(j) injunction, the job might have been gone by the time Bishop moved back to Otis. Moreover, acceptance of Angle's interim offer would have entailed a one hundred mile

relocation, the second such move within eight months. If an employee does not incur a willful loss of earnings by refusing to move one hundred miles to accept an offer of permanent employment, *Florence Printing Co. v. NLRB, supra,* we cannot understand how Bishop could be found to have incurred a willful loss of earnings by refusing to leave his permanent job and move one hundred miles for the second time to accept temporary employment. We believe that under prior Board decisions it cannot be thought that Bishop acted unreasonably in choosing to remain in Wichita rather than accepting Angle's offer. We therefore hold that Bishop did not incur a willful loss of earnings.

The order of the Board is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

9. Bishop finished the second quarter of 1967 earning $1,421.62 in contrast to $2,086.38 at the KRH plant. In the remaining quarters he earned considerably less at his new job, finally earning higher wages for the first time in the third quarter of 1970—$1,316.17 in contrast to a calculated $999.81 from Angle.

10. In fact the § 10(j) injunction was affirmed on appeal on August 28, 1967. *Angle v. Sacks,* 382 F.2d 655 (10th Cir. 1967).